[No. A116938. First Dist., Div. Two. Feb. 14, 2008.]

SUSAN COHEN, Plaintiff and Appellant, v.
FIVE BROOKS STABLE, Defendant and Respondent.

1478

**COUNSEL**

Law Offices of Frank J. Christy and Frank J. Christy, Jr., for Plaintiff and Appellant.

Selman Breitman and Edward C. Schroeder, Jr., for Defendant and Respondent.

**OPINION**

**KLINE, P. J.**—Appellant Susan Cohen sustained injury as a result of a fall from a horse during a guided trail ride provided her by respondent Five Brooks Stable. Two questions are presented: whether by signing a "Visitor's Acknowledgement of Risk" (the Release) appellant expressly waived her negligence claim and, if not, whether respondent is nevertheless exonerated by the doctrine of primary assumption of risk. Granting summary judgment on the ground that the Release constituted an express waiver, the trial court found it unnecessary to inquire into the applicability of the doctrine of primary assumption of risk.

We shall conclude, first, that the Release does not clearly and unambiguously inform an ordinary person untrained in the law that its purpose and effect is to exempt respondent from liability for its own negligence. We shall also conclude that summary judgment is not supported by the doctrine of primary assumption of risk. Accordingly, we shall reverse the judgment.

## FACTS AND PROCEEDINGS BELOW

In August 2004, appellant, her friend Kathy Lord, and two others went on a horseback ride on the Olema Trail in the Golden Gate National Recreational Area in Marin County (GGNRA) on horses rented from respondent. Mark Wimple, an employee of respondent, was their guide. During the course of the trip, appellant fell from her horse and was injured. The gist of the complaint is that Wimple, knowing the horses behind him would follow and adjust to the gait of his horse, suddenly caused his horse to gallop without warning the other riders, thereby causing appellant's horse also to gallop. Unable to control her bolting horse, appellant fell from the saddle and, with one foot caught in the stirrup, was dragged across the ground, sustaining injuries.

On October 5, 2005, appellant filed a complaint alleging a single count of negligence. On November 4, 2005, respondent answered with a general denial and raised 17 affirmative defenses. Seven months later, on June 5, 2006, respondent filed a motion for summary judgment based on two of those defenses: express and implied assumption of risk. The defense of express assumption of the risk was based on the Release appellant signed on the date of the incident.

Although the summary judgment motion was based primarily on express waiver based on the Release, respondent alternatively relied on the claim that it had no duty of care to appellant under the doctrine of primary assumption of risk because "a fall from a horse on a trail ride is a risk inherent in the sport." Acknowledging that an operator of a recreational sports facility does not have a duty to protect against risks inherent in the sport, appellant rests on the rule that such an operator does have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport. (*Knight v. Jewett* (1992) 3 Cal.4th 296, 315–316 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*).) The theory of her complaint is that Wimple's conduct substantially increased the risk inherent in the trail riding of horses. In support of her argument that there were disputed issues of material fact with respect to that issue, appellant emphasized portions of her deposition testimony and that of Lord and Wimple demonstrating a conflict in the evidence as to whether Mark Wimple's conduct conformed to the standard of care he himself deemed applicable.

Wimple testified at deposition that the only gaits permitted on the Olema Valley trails were walking, trotting and cantering, but not galloping; he was instructed by his employer, and it was his custom, to obtain from "each person" in a group his or her consent to increase the gait from a walk to a trot, or from a trot to a canter; in obtaining such consent he normally turned around on his horse (which was always the lead horse) to face the members in the group; there were no circumstances "where you could run horses at a trot or a canter, without getting the consent of the people in your party." Wimple said that after obtaining consent from members of a group to trot or canter, he would announce to all of them that he was going to increase the gait of his lead horse before actually doing so, as, for example, by asking, "[y]ou guys want to canter?" When asked whether he did so before he cantered or galloped his horse on the way back to the stable and appellant was thrown from her horse, Wimple answered: "I believe that I did. But I cannot say for sure."

Wimple's recollection that he obtained appellant's consent and that of all other members of the group before allowing them to canter on the way back to the stable, and his implication that at the time he did so he turned around to look at them, is flatly contradicted by the testimony of appellant and Lord.

Appellant testified that after the group had made a U-turn and was on its way back to the stable, she was behind Lord who was right behind Wimple, who was on the lead horse. At some point, Lord's horse suddenly leapt into a

gallop, and appellant's horse and those of the two other riders all immediately followed suit. Appellant did not at the time know why Lord's horse bolted, but Lord later explained it was because Wimple suddenly urged his horse into a gallop. Appellant testified that at the time Lord's horse accelerated and a "split second" later, when her own horse started "galloping," appellant was unable to see Wimple, who was ahead around a bend in the trail. At no time during the return to the stable did appellant ever see Wimple turn around in his saddle or hear him "tell anybody that he was proceeding in a faster pace than a walk." After losing control of her horse, appellant lost her balance and fell off to the ground on the right side. Because her right foot was caught in the stirrup, she was for a period of time dragged along the ground on her buttocks and back and was injured.

Lord testified that at the time of the incident she was a horse length behind Wimple and appellant was some distance behind her. Wimple's horse was never out of his control. Without advance warning to the riders behind him, Wimple intentionally "took off." According to Lord, Wimple's horse, which "looked like it was galloping to me," ran so far ahead of the others that Wimple "didn't know what his riders were doing behind him. And I had to yell at him to say: 'Stop. Something has happened.' And then he comes back to us. When he finally gets back, he was more concerned about getting the horses so he didn't have to walk out, which we ended up doing anyway because [appellant] could not get on the horse." According to Lord, an experienced rider, "horses are herd animals" and instinctively follow the gait of the trail guide's lead horse. In her view a responsible trail guide would not, on the way back to the stable, have gone faster than a walk, and certainly not accelerated from a walk to a canter or gallop suddenly and without notice, as Wimple did. When Wimple's horse began galloping, Lord's horse "went crazy" and was briefly out of control. This also happened to Justin, one of the others in the group, who was riding behind appellant. He was fearful his galloping horse would trample appellant while she was being dragged along the ground with her foot caught in the stirrup. Justin fell off his horse while trying to guide it away from appellant.

The trial court never addressed the conflict in the evidence relating to Wimple's conduct, nor appellant's claim that this conduct negligently increased a risk inherent in horseback riding, focusing instead on the Release. The order granting summary judgment states that the Release was " 'clear, unambiguous, and explicit, and . . . express[es] an agreement not to hold [respondent] liable for negligence' [citation]" and that the conduct of Wimple was within the scope of the Release. The court noted that the Release states a " 'specifically identified' risk of horseback riding, that a horse 'may and will' 'run' 'without warning and without apparent cause,' and that this risk can arise from 'movement of people [or] other horses.' Moreover, the Release

also applies to 'other unknown or unanticipated risks' that are 'not specifically identified' therein." For these reasons, the court determined that, even if Wimple's conduct was negligent and increased the risk inherent in horseback riding, "[appellant] assumed the risk of the injuries that occurred."

## STANDARD OF REVIEW

Appellate review of a summary judgment is limited to the facts shown in the supporting and opposing affidavits and those admitted and uncontested in the pleadings. As in the trial court, the moving party's papers are strictly construed and the opposing party's are liberally construed. All doubts as to the propriety of granting the motion—i.e., whether there is any triable issue of material fact—are to be resolved in favor of the party opposing the motion. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768–769 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) While appellate review operates under the same general principles applicable in the trial court, the appellate court must independently determine the construction and effect of the facts presented to the trial judge as a matter of law. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517]; *Saldana v. Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1511–1515 [285 Cal.Rptr. 385].) " 'As a corollary of the de novo review standard, the appellate court may affirm a summary judgment on any correct legal theory, as long as the parties had an adequate opportunity to address the theory in the trial court. . . .' [Citation.]" (*California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22 [4 Cal.Rptr.3d 785], quoting Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1989) ¶ 8:168.5a, pp. 8-98.3 to 8-98.4 (rev. # 1, 2001).)

As will be seen, the trial court's ruling was based on its interpretation of the Release appellant signed as negating the duty element of her negligence claim. "Contract principles apply when interpreting a release, and 'normally the meaning of contract language, including a release, is a legal question.' (*Solis v. Kirkwood Resort Co.* (2001) 94 Cal.App.4th 354, 360 [114 Cal.Rptr.2d 265].) 'Where, as here, no conflicting parol evidence is introduced concerning the interpretation of the document, "construction of the instrument is a question of law, and the appellate court will independently construe the writing." ' (*Paralift, Inc. v. Superior Court* (1993) 23 Cal.App.4th 748, 754 [29 Cal.Rptr.2d 177].) 'It therefore follows that we must independently determine whether the release in this case negated the duty element of plaintiff['s] cause[] of action.' (*Allabach v. Santa Clara County Fair Assn.* [(1996)] 46 Cal.App.4th [1007,] 1011 [54 Cal.Rptr.2d 330].)" (*Benedek v. PLC Santa Monica* (2002) 104 Cal.App.4th 1351, 1356 [129 Cal.Rptr.2d 197] (*Benedek*).)

## DISCUSSION

As indicated, the grant of summary judgment was based solely on the trial court's determination that respondent's alleged negligence was within the express scope of the Release she signed. Defending that analysis, respondent maintains the ruling can also be sustained under the doctrine of primary assumption of risk. We shall address these issues separately; however, because there is some interplay between them, it is useful at the outset to emphasize their difference.

With respect to the question of express waiver, the legal issue is *not* whether the particular risk of injury appellant suffered is inherent in the recreational activity to which the Release applies (*Benedek, supra,* 104 Cal.App.4th at p. 1357; *Allan v. Snow Summit, Inc.* (1996) 51 Cal.App.4th 1358, 1372–1375 [59 Cal.Rptr.2d 813]; *Madison v. Superior Court* (1988) 203 Cal.App.3d 589, 602, fn. 11 [250 Cal.Rptr. 299]), but simply *the scope of the Release.* The language of the Release is not pertinent to the applicability of the doctrine of primary assumption of risk. With respect to that issue, the central question is whether the conduct of Wimple complained of was itself an inherent risk of recreational trail riding or whether Wimple did anything to increase that risk.

### I.

### Risk of the Injury Appellant Suffered Is Not Within the Scope of the Release

The order granting summary judgment concludes that "[t]he alleged conduct of the trail guide is within the scope of the Release," because (1) "the Release states a 'specifically identified' risk of horseback riding, that a horse 'may and will' 'run' 'without warning and without apparent cause,' " and, in any case, (2) "the Release also applies to 'other unknown or unanticipated risks' that are 'not specifically identified' therein."

The difficulty in deciphering the order relates to whether the court found that the risks referred to in the Release—particularly those "not specifically identified" therein—are limited to risks *inherent* in horseback riding or whether they also encompass the risk of harm from misconduct of respondent or its employees that *increase a risk inherent* in horseback riding. As we shall see, the court could have concluded that the Release pertains to the latter risk only if the Release unambiguously exempted respondent from liability for its own negligence or for any and all risks appellant encountered while using respondent's facilities.

■ "A written release may exculpate a tortfeasor from future negligence or misconduct. [Citation.] To be effective, such a release *'must be clear, unambiguous, and explicit in expressing the intent of the subscribing parties.'* [Citation.] The release need not achieve perfection. [Citation.] Exculpatory agreements in the recreational sports context do not implicate the public interest and therefore are not void as against public policy. [Citations.] [¶] The determination of whether a release contains ambiguities is a matter of contractual construction. [Citation.] 'An ambiguity exists when a party can identify an alternative, semantically reasonable, candidate of meaning of a writing. [Citations.] An ambiguity can be patent, arising from the face of the writing, or latent, based on extrinsic evidence.' [Citation.] . . . If an ambiguity as to the scope of the release exists, it should normally be construed against the drafter. [Citations.]" (*Benedek, supra,* 104 Cal.App.4th at pp. 1356–1357, italics added, fn. omitted.)

■ The scope of a release is determined by its express language. "The express terms of the release must be applicable to the particular negligence of the defendant, but every possible specific act of negligence of the defendant need not be spelled out in the agreement. [Citation.] When a release expressly releases the defendant from any liability, it is not necessary that the plaintiff have had a specific knowledge of the particular risk that ultimately caused the injury. [Citation.] If a release of all liability is given, the release applies to any negligence of the defendant. ' "It is only necessary that the act of negligence, which results in injury to the releaser, be reasonably related to the object or purpose for which the release is given." ' [Citation.]" (*Benedek, supra,* 104 Cal.App.4th at p. 1357.) As we have said, "[t]he issue is not whether the particular risk of injury is inherent in the recreational activity to which the release applies, but rather the scope of the release." (*Ibid.*)

The exculpating provision of the Release that the trial court found "clear, unambiguous, and explicit" is the language declaring that "[a]ll horses, even those that are well trained and appear calm and docile, may and will: [among other things] run and bolt uncontrollably . . . without warning and without apparent cause," and that this "may be in response to external stimuli . . . which may induce feelings of fear, panic or anger, leading to some degree of reflex action on the part of the horse." We fully agree, and indeed it is indisputable, that the risks to which the Release applies are those inherent in horseback riding. As the Release states, "[c]ertain risks cannot be eliminated [from horseback riding] without destroying the unique character of this activity. The same elements that contribute to the unique character of this activity can be causes of loss or damage to your equipment, or accidental injury, illness, or in extreme cases, permanent trauma or death. We do not

want to frighten you or reduce your enthusiasm for this activity, but we do think that it is important for you to know, in advance, what to expect, and to be informed of *the inherent risks*. The following describes some, but not all, of *these risks*." (Italics added.) The description in the Release of "some, but not all," of the inherent risks, includes the risk that "[a]ll horses, even those that are well trained and appear calm and docile, may and will: buck, rear, kick, bite, run and bolt uncontrollably," and this risk "may occur without warning and without apparent cause . . . in response to external stimuli (such as . . . movement of people [and] other horses . . .) . . . ." By signing the Release, appellant expressly agreed "to assume responsibility for the risks *identified herein* and *those risks not specifically identified*." (Italics added.)

Clearly, *all* of the risks explicitly described in the Release—which arise from the stated fact that even well trained horses "may and will: buck, run, kick, bite, run and bolt uncontrollably . . . without warning and without apparent cause"—are inherent in horseback riding. As noted, the paragraph in which these risks are described follows directly after the statement that, in order to inform the signor of the Release "of the *inherent risks*[,] [t]he following describes some, but not all, of *these* risks" (italics added), i.e., "some, but not all" of the risks inherent in horseback riding. Whether "those risks not specifically identified" are also limited to risks inherent in horseback riding is, however, unclear. The problematic language consists of the following two sentences: "I understand that the [previous] description of these [i.e., inherent] risks is not complete and that other unknown or unanticipated risks may result in injury or death. I agree to assume responsibility for the risks identified herein *and those risks not specifically identified*." (Italics added.) The "risks not specifically identified" could refer to the risks inherent in horseback riding left unidentified by the phrase "some, but not all," which seems to us the most reasonable assumption, but it might also refer to risks arising out of respondent's negligence that increases the inherent risks. Because an interpretation of the reference in the Release to "those risks not specifically identified" as pertaining only to unspecified risks inherent in horseback riding is " 'semantically reasonable' " (*Benedek, supra,* 104 Cal.App.4th at p. 1357), the Release is ambiguous, and the ambiguity must be resolved against respondent, the drafter of the instrument. (*Ibid.,* citing Civ. Code, § 1654; *Solis v. Kirkwood Resort Co., supra,* 94 Cal.App.4th at p. 360.)

It is clear, however, that the trial court found the scope of the Release unambiguous. Aware, as it must have been, that the complaint alleged that respondent violated its duty to use care not to increase any of the risks inherent in horseback riding,[1] the trial court apparently granted summary

---

[1] The operative paragraphs of appellant's three-page complaint allege that at all material times, Wimple "knew or should have known that the horse that Plaintiff was riding would follow the horse that [he was] riding; and that on the way back to the horse stables, [Wimple],

judgment on the theory that the risks "not specifically identified" in the Release include the risk that misconduct of respondent or its employee might *increase* a risk inherent in horseback riding. Knowing an agreement not to hold a defendant liable for its future negligence must express such intent clearly, unambiguously, and explicitly, the court found that it did. Emphasizing that "the Release also applies to 'other unknown or unanticipated risks' that are 'not specifically identified' therein," the court's order states that the Release was sufficiently " 'clear, unambiguous, and explicit, and . . . express[es] an agreement not to hold [defendant] liable for negligence.' " The finding that appellant released respondent from liability for negligently increasing a risk inherent in horseback riding, as the complaint alleges, explains why the court found it unnecessary to inquire whether there were disputed issues of fact relevant to that factual question.

We find the trial court's interpretation of the Release erroneous. The court not only improperly resolved the ambiguity in favor of the drafter, but ignored the principle that a Release relieves a defendant of the consequences of its own negligence only if it does so in "clear, unambiguous, and explicit" language.[2] (*Benedek, supra,* 104 Cal.App.4th at p. 1356; *Leon v. Family Fitness Center (# 107), Inc.* (1998) 61 Cal.App.4th 1227, 1235 [71 Cal.Rptr.2d 923]; *Bennett v. United States Cycling Federation, supra,* 193 Cal.App.3d at p. 1490; see also *Sweat v. Big Time Auto Racing, Inc.* (2004) 117 Cal.App.4th 1301 [12 Cal.Rptr.3d 678].) The Release before us does not do so.

---

without warning, caused the horse [he was] riding to take off in a full gallop thereby causing Plaintiff's horse to take off at a full gallop—which Plaintiff—as an inexperienced rider was not capable of handling. [¶] . . . [Wimple] so carelessly and negligently conducted Plaintiff's horse ride *so as to increase the risk of injury to Plaintiff* and caused Plaintiff to be thrown off her horse; thereby causing Plaintiff to be dragged across the ground until her foot became dislodged from the stirrup of her saddle and causing Plaintiff to sustain the injuries and damages hereinafter mentioned." (Italics added.)

[2] Our dissenting colleague makes the same mistake. The dissent concludes that there is no discernible, "commonsense difference between a release/express assumption of risk (1) which covers 'the risks identified herein [including the risk that a horse "may and will . . . run and bolt uncontrollably"] and those risks not specifically identified' and (2) one which covers 'any and all risks the releasor encounters while on the former's premises or using its facilities.' " (Dis. opn., *post,* at p. 1502, italics omitted.) This unexplained conclusion is doubly flawed. First, by assuming that risks inherent in horseback riding and "risks not specifically identified" together include "any and all risks the releasor encounters while on the former's premises or using its facilities" unjustifiably resolves an ambiguity in favor of the drafter of the instrument. Second, by assuming that the Release covers injuries caused by respondent's own negligence, an issue the document never adverts to, the dissent also ignores the principle that in order to exculpate a tortfeasor from its own future negligence or misconduct a release " 'must be clear, unambiguous, and explicit in expressing [that] intent of the subscribing parties.' " (*Benedek, supra,* 104 Cal.App.4th at p. 1356, quoting *Bennett v. United States Cycling Federation* (1987) 193 Cal.App.3d 1485, 1490 [239 Cal.Rptr. 55].)

 "The Restatement Second of Torts aptly states: 'In order for the agreement to assume the risk to be effective, it must also appear that its terms were intended by both parties to apply to *the particular conduct of the defendant which has caused the harm*. Again, where the agreement is drawn by the defendant and the plaintiff passively accepts it, its terms will ordinarily be construed strictly against the defendant.' (Rest.2d Torts, § 496B, com. *d*, p. 566.) Along the same lines, Professors Prosser and Keeton observe: 'If an express agreement exempting the defendant from liability for his negligence is to be sustained, it must appear that its terms were brought home to the plaintiff; and if he did not know of the provision in his contract, and a reasonable person in his position would not have known it, it is not binding upon him, and the agreement fails for want of mutual assent. *It is also necessary that the expressed terms of the agreement be applicable to the particular misconduct of the defendant*, and *the courts have strictly construed the terms of exculpatory clauses against the defendant who is usually the draftsman*.' (Prosser and Keeton on Torts (5th ed. 1984) Assumption of Risk, ch. 11, § 68, pp. 483–484, [first] italics added [by *Bennett* court], fns. omitted.)" (*Bennett v. United States Cycling Federation, supra*, 193 Cal.App.3d at p. 1490, second italics added.) The Release presented to appellant clearly does not unambiguously, let alone explicitly, release respondent from liability for injuries caused by its negligence or that of its agents and employees which increase a risk inherent in horseback riding.

 California courts require a high degree of clarity and specificity in a Release in order to find that it relieves a party from liability for its own negligence. The release must "*clearly*, explicitly and comprehensibly set forth to an ordinary person untrained in the law that the intent and effect of the document is to release his claims for his own personal injuries and to indemnify the defendants from and against liability to others which might occur in the future as a proximate result *of the negligence of [the] defendants . . . .*" (*Ferrell v. Southern Nevada Off-Road Enthusiasts, Ltd.* (1983) 147 Cal.App.3d 309, 319 [195 Cal.Rptr. 90]; see *Scroggs v. Coast Community College Dist.* (1987) 193 Cal.App.3d 1399, 1404 [239 Cal.Rptr. 916] ["The presence of a clear and unequivocal waiver with specific reference to a defendant's negligence is a distinct requirement where the defendant seeks to use the agreement to escape responsibility for the consequences of his negligence."].) This does not mean use of the word "negligence" or any particular verbiage is essential (see *Sanchez v. Bally's Total Fitness Corp.* (1998) 68 Cal.App.4th 62, 66–67 [79 Cal.Rptr.2d 902]), but that the release must inform the releasor that it applies to misconduct on the part of the

releasee. The Release before us clearly does not. The word "negligence" is used but once, and in a way that refers *only* to *appellant's* negligence, not that of respondent. After a sentence in which appellant certifies that "I am fully capable of participating in this activity," the Release states: "Therefore, I assume full responsibility for myself, including my minor children, for bodily injury, death and loss of personal property and expenses thereof as a result of those *inherent risks* and dangers and of *my negligence in participating in this activity*." (Italics added.) Nothing in the Release clearly, unambiguously, and explicitly indicates that it applies to risks and dangers attributable *to respondent's negligence or that of an employee* that may not be inherent in supervised recreational trail riding. Nor does the Release indicate that it covers any and all injuries arising out of or connected with the use of respondent's facilities. (Cf. *Sanchez v. Bally's Total Fitness Corp.,* at p. 65.)

The trial court's order, which was prepared by counsel for respondent, cites *National & Internat. Brotherhood of Street Racers, Inc. v. Superior Court* (1989) 215 Cal.App.3d 934 [264 Cal.Rptr. 44] and *Benedek, supra,* 104 Cal.App.4th 1351, as support for its conclusion that the "[t]he alleged conduct of the trail guide is within the scope of the Release." The cited cases provide no support for this statement because both pertain to a comprehensive and unqualified release written in clear and unambiguous language absent in the subject Release.

In *National & Internat. Brotherhood of Street Racers, Inc. v. Superior Court, supra,* 215 Cal.App.3d 934, the plaintiff (an experienced race car driver who, after putting his car in reverse, accelerated at full throttle) signed an agreement releasing the defendant and others " 'from *any and all claims* and liability arising out of . . . *ordinary negligence of releasees* or any other participant which causes the undersigned injury, death, damages or property damage.' " (*Id.* at p. 936, italics added.) The court found the plaintiff driver misread the release, "which in unqualified terms releases all claims arising from [his] participation in the race." (*Id.* at p. 937.) The plaintiff in *Benedek, supra,* 104 Cal.App.4th 1351, was a member of a health club injured on the club's premises when he attempted to reposition a television and it slid off its rack, injuring him. The release found by the court to be "clear, unambiguous, and explicit" released the defendant "from liability for *any* personal injuries suffered while on [the defendant's] premises, 'whether using exercise equipment *or not.*' " (*Id.* at p. 1358, italics added.) Because "[t]he purpose for which the release was given was to allow [the plaintiff] 'access' to [the defendant's] 'facilities and services . . . ,' " it was therefore enough to bar the plaintiff's action that he "was injured while inside [the defendant's] facilities." (*Ibid.*) "Given its unambiguous broad language, the release reached all personal injuries suffered by [the plaintiff] on [the defendant's] premises . . ." (*ibid.*), *regardless whether they occurred while he was actively using its exercise equipment.*

Unlike the release in *National & Internat. Brotherhood of Street Racers, Inc. v. Superior Court, supra,* 215 Cal.App.3d 934, the Release here does not relieve respondent of liability from " 'any and all claims and liability arising out of [its] ordinary negligence' " which causes injury to the releasor (*id.* at p. 936), and unlike the release in *Benedek, supra,* 104 Cal.App.4th 1351, the Release here does not exempt respondent "from liability for *any* personal injuries suffered while on [respondent's] premises" (*id.* at p. 1358, italics added).

Indeed, the language of the Release appellant signed hardly relates at all to respondent's conduct,[3] let alone the particular conduct alleged to have caused the harm appellant suffered. A fair reading of the entire Release compels the conclusion that it does not make clear to an ordinary person untrained in the law that its purpose and effect is to release claims for one's own personal injuries resulting from respondent's negligent acts, including misconduct that increases a risk inherent in horseback riding. On the contrary, a person who understandingly signed the Release cannot be deemed to have waived any hazard *other than those inherent in the trail riding of horses.* Stated differently, the Release does no more than subject appellant to a legal principle— the doctrine of primary assumption of risk—that would apply even if the Release did not exist.

It has been said that "[d]rafters of releases always face the problem of steering between the Scylla of simplicity and the Charybdis of completeness" (*National & Internat. Brotherhood of Street Racers, Inc. v. Superior Court, supra,* 215 Cal.App.3d at p. 937), and that "only on Draftsman's Olympus is it feasible to combine the elegance of a trust indenture with the brevity of a stop sign" (*id.* at p. 938). While it is true, as we have seen, that California courts hold releases of liability to a high standard of clarity, it does not in our view require Olympian efforts to meet the standard. An effective release is hard to draft only if the party for whom it is prepared desires to hide the ball, which is what the law is designed to prevent. The "elegance" of trust indentures, which are notoriously incomprehensible to all but trained specialists, is hardly useful, and brevity is feasible.[4] A release that forthrightly makes clear to a person untrained in the law that the releasor gives up any

---

[3] The only statement in the Release that does contain a reference to respondent's conduct is the initial sentence of the second paragraph of the document: "Although FIVE BROOKS RANCH has taken reasonable steps to provide you with appropriate equipment and *skilled guides* so that you can enjoy an activity for which you may not be skilled, we wish to remind you that this activity is not without risk." (Italics added.)

[4] See, e.g., the release held valid in *Booth v. Santa Barbara Biplanes, LLC* (2008) 158 Cal.App.4th 1173, 1176 [70 Cal.Rptr.3d 660], which stated, "I VOLUNTARILY ASSUME ALL RISK, KNOWN AND UNKNOWN, OF INJURIES, HOWEVER CAUSED, EVEN IF CAUSED IN WHOLE OR IN PART BY THE ACTION, INACTION, OR NEGLIGENCE OF THE RELEASED PARTIES TO THE FULLEST EXTENT ALLOWED BY LAW." (Boldface omitted.)

claim against the releasee for the latter's own negligence (see, e.g., *Madison v. Superior Court, supra,* 203 Cal.App.3d 589, 594) or that the releasee cannot be held liable for *any and all risks* the releasor encounters while on the former's premises or using its facilities (see, e.g., *Benedek, supra,* 104 Cal.App.4th at p. 1358; *Sanchez v. Bally's Total Fitness Corp., supra,* 68 Cal.App.4th at pp. 64–65), ordinarily passes muster. Because the Release before us conveys neither of those ideas, we conclude that it does not exculpate respondent from its own negligence or that of an employee or agent.

The remaining question is whether the injury appellant sustained arose from a risk inherent in the activity in which she was engaged and respondent is therefore exonerated by the doctrine of primary assumption of risk.

## II.

### Whether Respondent's Liability Is Limited by the Doctrine of Primary Assumption of Risk Turns on Triable Issues of Material Fact

Respondent argues that, though the trial court did not explicitly rely on the principle of primary assumption of risk (because its order does not determine whether, as alleged in the complaint, Wimple's conduct increased a risk inherent in horseback riding), its ruling can nevertheless be sustained on that ground.

*Knight, supra,* 3 Cal.4th 296, recognizes that careless conduct by coparticipants is an inherent risk in many sports, and that holding participants liable for resulting injuries would discourage vigorous competition. For that reason, persons involved in a sporting activity do not have a duty to reduce the risk of harm inherent in the sport itself. However, *Knight* and its progeny (see, e.g., *Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 162 [41 Cal.Rptr.3d 299, 131 P.3d 383]) also explain that such persons do have a duty not to increase such inherent risks. Thus, sports participants have a limited duty of care that is breached only if they intentionally injure coparticipants or "engage[] in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Knight,* at p. 320, fn. omitted.)

*Harrold v. Rolling J Ranch* (1993) 19 Cal.App.4th 578 [23 Cal.Rptr.2d 671] (*Harrold*), holds that "horseback riding, even the rather tame sport of riding on the back of walking horses in an afternoon trail ride, carries some inherent risk of injury. A horse can stumble or rear or suddenly break into a gallop, any of which may throw the rider." (*Id.* at p. 587.) This does not mean a

commercial operator of a horse riding facility owes no duty of care and can never be liable for injuries suffered when a horse acts in a dangerous manner. Such an operator "has a duty to supply horses which are not unduly dangerous. . . . [and a] duty to warn the patrons renting a given horse if that horse has evidenced a predisposition to behave in ways which add to the ordinary risk of horse riding." (*Ibid.*, fn. omitted.) The operator also has a duty "not to provide faulty saddles, bridles and other equipment, not to provide dangerous trails, not to provide horses that are shodded poorly—and the list can go on and on." (*Id.* at p. 588.) However, the majority in *Harrold* held courts may not impose "a duty on stable owners to provide 'ideal' riding horses such that they never buck, bite, break into a trot, stumble or 'spook' when confronted by a frightening event on the trail such as a shadow or snake or react to peculiar movements of a rider such as excessive spurring or waving of a coat as in this case. We view sudden movements of a horse just as inherent in horseback riding as the presence of moguls on a ski slope are to skiers." (*Ibid.*)

The *Harrold* court concluded that the defendant stable operator had no duty to warn the plaintiff that a horse she selected on her own had recently spooked and thrown a rider. However, respondent ignores the rationale of that ruling. *Harrold* states that "[p]ublic policy supports not imposing a duty on commercial operators of horse-renting facilities which provide supervised trail rides, to supply 'ideal' horses, but we stop short of eliminating any duty such as a duty to warn of a dangerous propensity in a given horse." (*Harrold, supra,* 19 Cal.App.4th at p. 588.) The only reason the *Harrold* majority found no duty to warn in that case was that "the one prior incident of the subject horse having spooked does not rise to the level of a dangerous propensity, in our opinion. It does rise to the level of a 'horse behaving as a horse' with no incumbent duty on the part of the stable operator. In our opinion, to impose some sort of duty on a lessor of horses when a 'horse acts as a horse' is to tell the commercial world that strict liability is imposed for any action of a horse inherent in horseback riding, with the concomi[tant] result that in all probability all commercial horseback riding will cease because of the risk involved to those that are self-insured or by reason of the prohibitive expense to obtain liability insurance for such an enterprise." (*Ibid.*)

The rationale of the refusal to find a duty in *Harrold* has no application to this case. Appellant does not complain about the conduct of the horse assigned her, but about that of the trail guide she was provided. A spooked horse that throws a rider may be a "horse acting as a horse," but a trail guide who unexpectedly provokes a horse to bolt and run without warning its rider is not in our opinion a "trail guide acting as a trail guide." This is particularly

true here. Wimple testified that "many" of the riders he supervised "are riding for the first time or haven't ridden for a while," and the Release presented all prospective riders informed them that respondent "has taken reasonable steps to provide you with . . . *skilled guides* so that you can enjoy an activity for which you may not be skilled." (Italics added.) Respondent does not explain, and we do not know, why imposition on trail guides of a duty not to endanger a rider by, without warning, inciting his or her horse to bolt and gallop would diminish participation in commercial horseback riding or create any significant risks for the operators of commercial horseback riding facilities. The case law provides no rationale upon which to conclude that the risk of such conduct by a trail guide is inherent in the recreational trail riding of horses.

The parties both rely upon *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990 [4 Cal.Rptr.3d 103, 75 P.3d 30] (*Kahn*), but for different reasons. In that case, a member of a school swim team broke her neck during a swim meet when she made a practice dive into a shallow pool on school property. In a suit against the school she alleged that her injury was caused in part by the failure of her coach, a school employee, to instruct her how to safely dive into a shallow pool. She also sued the coach for failing to adequately supervise her and threatening to dismiss her from the team if she did not dive. The Supreme Court applied the doctrine of primary assumption of risk to sustain the grant of summary judgment for the coach insofar as it was based on the relationship between a coach and an athlete. Respondent relies upon the following statement in *Kahn*: "because a significant part of an instructor's or coach's role is to challenge or 'push' a student or athlete to advance in his or her skill level and to undertake more difficult tasks, and because the fulfillment of such a role could be improperly chilled by too stringent a standard of potential legal liability, we conclude that the same general standard [as applies to sports competitors] should apply in cases in which an instructor's alleged liability rests primarily on a claim that he or she challenged the player to perform beyond his or her capacity or failed to provide adequate instruction or supervision before directing or permitting a student to perform a particular maneuver that has resulted in injury to the student." (*Kahn*, at p. 996.) However, respondent ignores the fact that Wimple was not acting as a coach or riding instructor (see discussion, *post*, at pp. 1497–1498), and also the language in *Kahn* appellant specifically relies upon, namely, that even a coach may be found to have breached a duty of care to a student or athlete if he or she "intentionally injures the student or engages in conduct that is reckless in the sense that it is 'totally outside the range of the ordinary activity' [citation] involved in teaching or coaching the sport." (*Kahn*, at p. 996, quoting *Knight, supra,* 3 Cal.4th at p. 320.)

The Supreme Court recently relied upon *Kahn* in *Shin v. Ahn* (2007) 42 Cal.4th 482 [64 Cal.Rptr.3d 803, 165 P.3d 581]. In that case, the plaintiff sued the defendant for negligence as a result of injuries he sustained when the defendant's tee shot hit him in the head during a round of golf. The trial court denied summary judgment for the defendant and the Court of Appeal affirmed, as did the Supreme Court, which remanded the case with directions that litigation should continue under the primary assumption of risk doctrine. The high court held that the doctrine of primary assumption of risk applies to golf and that being struck by a carelessly hit ball is an inherent risk of the sport. However, the court nevertheless concluded that summary judgment was properly denied because "whether defendant breached the limited duty of care he owed other golfers by engaging in conduct that was 'so reckless as to be totally outside the range of the ordinary activity involved in [golf]' [citation] depends on resolution of disputed material facts." (*Id.* at p. 486.) "In determining whether defendant acted recklessly, the trier of fact will have to consider both the nature of the game and the totality of circumstances surrounding the shot. In making a golf shot the player focuses on the ball, unlike other sports in which a player's focus is divided between the ball and other players. That is not to say that a golfer may ignore other players before making a shot. Ordinarily, a golfer should not make a shot without checking to see whether others are reasonably likely to be struck. Once having addressed the ball, a golfer is not required to break his or her concentration by checking the field again. Nor must a golfer conduct a head count of the other players in the group before making a shot. [¶] Many factors will bear on whether a golfer's conduct was reasonable, negligent, or reckless. Relevant circumstances may include the golfer's skill level; whether topographical undulations, trees, or other impediments obscure his view; what steps he took to determine whether anyone was within range; and the distance and angle between a plaintiff and defendant." (*Id.* at pp. 499–500, fn. omitted.)

*Kahn, supra,* 31 Cal.4th 990, and *Shin v. Ahn, supra,* 42 Cal.4th 482, both indicate that summary judgment cannot be upheld in this case on the basis of the doctrine of primary assumption of risk. As in those cases, there are disputed issues of material fact as to whether the conduct of respondent's trail guide was "so reckless as to be totally outside the range of the ordinary activity involved in the sport" in which appellant was engaged. (*Knight, supra,* 3 Cal.4th at p. 320, fn. omitted.)

Unlike the activity at issue in *Kahn,* recreational trail riding is not a competitive sport, and many of those who engage in it do so only occasionally and, as the Release acknowledges, are often unskilled. The responsibility of a trail guide is not just to ensure to the extent possible that recreational riders exercise due care, but to ensure that his or her own conduct also conforms to the degree of care appropriate to the circumstances. Wimple's own testimony strongly suggests that the applicable standard of care requires

him to seek and obtain the consent of riders and give notice before increasing the gait of walking horses. He recollected that prior to the incident in which appellant was injured he requested such consent and obtained it before moving his lead horse into a canter. As noted, that testimony was directly contradicted by both appellant and Lord, who also testified that Wimple moved his horse into a gallop, not a canter, without any warning whatsoever, and that at the time he began galloping his horse the only rider in the group even within his field of vision was Lord. This conflict in the evidence, which presents a triable issue of material fact, precludes a pretrial legal determination whether Wimple did or did not act "recklessly" within the meaning of *Knight*.

As in *Kahn, supra*, 31 Cal.4th 990, and *Shin v. Ahn, supra*, 42 Cal.4th 482, many as yet undetermined factors will bear on whether Wimple's conduct was "so reckless as to be totally outside the range of the ordinary activity involved in [recreational trail riding]." (*Knight, supra*, 3 Cal.4th at p. 320, fn. omitted.) In making that determination, the trier of fact will need to consider both the nature of trail riding and the totality of circumstances surrounding appellant's injury. Without attempting to identify all of the relevant factors, they will likely include the skill levels of appellant and the other riders in her group, rules pertaining to the use of Olema Valley trails, instructions Wimple may have received from his employer, whether a competent trail guide would know other horses would instinctively follow the pace of his lead horse, and whether Wimple was able to observe all of the riders in his group at the time he accelerated the pace of his horse.

Finally, we address the dissent's claim that summary judgment should be affirmed due to appellant's failure to adequately allege and prove the requisite "recklessness." To begin with, the "recklessness" with which we are concerned is not the "reckless disregard of the safety of another" described in section 500 of the Restatement Second of Torts as distinct from and more culpable than ordinary negligence and discussed in *Delaney v. Baker* (1999) 20 Cal.4th 23 [82 Cal.Rptr.2d 610, 971 P.2d 986],[5] which the dissent erroneously thinks pertinent to this case.[6] (Dis. opn., *post*, at pp. 1507–1510.) The

---

[5] As Witkin points out, "[t]he division of negligence into degrees ('slight,' 'ordinary,' and 'gross') has been criticized by modern courts and writers. It has been pointed out that frequently, in cases where a higher 'degree' of care is said to be required, all that is meant is that the particular circumstances require a greater *amount* of care, but that the *standard* remains the same . . . ." (6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 869, p. 98.)

[6] *Delaney v. Baker, supra*, 20 Cal.4th 23, was not a common law tort action, was not decided on summary judgment, and had nothing to do with the doctrine of primary assumption of risk. The case concerned the relationship between two parts of the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600 et seq.), which proscribes elder abuse and provides heightened remedies where the defendant has been found guilty of "recklessness,

"recklessness" here applicable consists instead of the very different type of conduct described in *Knight, supra*, 3 Cal.4th 296, namely, that which is "reckless" in the sense that it is "totally outside the range of the ordinary activity involved in the sport." (*Id.* at p. 320, fn. omitted.) *Knight* "recklessness" need not be specifically alleged in the complaint (*Kahn, supra*, 31 Cal.4th at p. 1013 & fn. 4) because that issue became relevant only when respondent's answer raised the affirmative defense of primary assumption of risk; a complaint "should not state and attempt to controvert matters that the defendant might raise in [the] answer." (4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 381, pp. 481–483.)

The dissent's main objection, that appellant has failed to show the necessary "recklessness," seems to us indifferent to the law, not just the evidence, because it turns the standard of review on its head. As a legion of cases makes clear, a defendant cannot obtain summary judgment in his favor unless he "has shown that the plaintiff cannot establish at least one element of the cause of action by showing that the plaintiff does not possess, and cannot reasonably obtain, needed evidence . . . ." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854 [107 Cal.Rptr.2d 841, 24 P.3d 493]; e.g., *Saelzler v. Advanced Group 400, supra*, 25 Cal.4th at p. 767; *Mateel Environmental Justice Foundation v. Edmund A. Gray Co.* (2003) 115 Cal.App.4th 8, 16–17 [9 Cal.Rptr.3d 486].) In determining whether a defendant awarded summary judgment has met this test, the reviewing court shall " 'strictly construe the moving party's papers and liberally construe those of the opposing party to determine if they raise a triable issue of material fact.' [Citation.]" (*Bushnell v. Japanese-American Religious & Cultural Center* (1996) 43 Cal.App.4th 525, 529 [50 Cal.Rptr.2d 671].) While the burden of producing evidence may shift, "[t]he burden of persuasion remains with the party moving for summary judgment." (*Kahn, supra*, 31 Cal.4th at p. 1003, citing *Aguilar*, at pp. 850, 861.) Moreover, "[i]n ruling on the motion, the court must view the evidence in the light most favorable to the opposing party." (*Shin v. Ahn, supra*, 42 Cal.4th at p. 499.)

The dissent does precisely the opposite; instead of asking whether respondent has established, as a matter of undisputed fact, "either that one or more elements of the cause of action cannot be established or that there is a complete defense" (*Mateel Environmental Justice Foundation v. Edmund A. Gray Co., supra*, 115 Cal.App.4th at pp. 16–17; see *Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at pp. 853–854), the dissent places the

oppression, fraud, or malice in the commission of [such] abuse" (Welf. & Inst. Code, § 15657). The question in the case was whether a defendant which engages in "reckless neglect" *within the meaning of that statute* (*Delaney*, at pp. 28–29) will be held subject to the heightened remedies the elder abuse act elsewhere provides. The statutory "recklessness" at issue in *Delaney* is, of course, very different from the "recklessness" defined by *Knight, supra*, 3 Cal.4th 296, and nothing in *Delaney* bears upon the issues in this case.

burden on appellant to persuade the court respondent has no such defense, and compounds the error by construing the papers of the opposing party strictly and viewing the evidence in the light most favorable to the moving party.

As noted in *Maxwell v. Colburn* (1980) 105 Cal.App.3d 180 [163 Cal.Rptr. 912], the statute setting forth the procedure for summary judgment "requires the trial court to consider all inferences reasonably deducible from the evidence; hence, the fact that appellants' attorney did not urge the trial court at the original hearing on the motion [for summary judgment] to draw certain specific inferences of negligence *does not relieve the trial court or this court from a duty to take those inferences into account.*" (*Id.* at p. 185, italics added; see Code Civ. Proc., § 437c, subd. (c).) " 'Only when the inferences are indisputable may the court decide the issues as a matter of law. If the evidence is in conflict, the factual issues must be resolved by trial. "Any doubts about the propriety of summary judgment . . . are generally resolved *against* granting the motion, because that allows the future development of the case and avoids errors." ' " (*Schachter v. Citigroup, Inc.* (2008) 159 Cal.App.4th 10, 17 [70 Cal.Rptr.3d 776], quoting *Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 839 [89 Cal.Rptr.2d 540].) *None* of the inferences the dissent draws from the deposition testimony is "indisputable." For example, the dissent's inference that Wimple "clearly was" a "coach or instructor" (dis. opn., *post*, at p. 1505) (suggesting that his conduct is therefore comparable to that of the defendant swim coach in *Kahn*) is contradicted by Wimple's description of his duties. When asked whether he gave the riders he supervised "lessons or anything along those lines?—or pointers," Wimple replied: "Well, if they asked for help, certainly. Occasionally I would say: 'How are you guys doing,' to give them another chance to say if they needed any help. [¶] Most of the time, people say, 'Fine.' Rarely does it come up. It's not for riding instruction. [¶] . . . [¶] . . . [R]iding lessons are one thing; a trail ride is another." Wimple's testimony indicates that his responsibility as a trail guide consisted of selecting the trails a group would use, ensuring that horses stayed in single file, and controlling the speed at which horses were allowed to move.

The dissent's statement that the evidence offered in opposition to the motion for summary judgment does not "even hint[]" that the conduct of Wimple was "reckless" within the meaning of *Knight* (dis. opn., *post*, at p. 1506) is baffling, as it ignores the manifest conflict in the deposition testimony as to that central question. As earlier related, Wimple testified that in order to protect riders against injury he felt obliged to obtain their consent before allowing the gait of horses in the group to increase from a walk to any faster pace, and after receiving consent, to notify riders of his intent to increase the pace before actually doing so, and this was invariably his practice. He also denied galloping his horse on the day appellant was injured,

because galloping was prohibited on Olema Valley trails. Appellant and Lord directly contradicted this testimony. Lord testified that Wimple suddenly galloped his horse on the day in question, prompting appellant's horse to bolt as well, and she and appellant both stated that he did so without obtaining the consent of any rider and without any warning. Respondent has provided no evidence that a competent trail guide would not know that suddenly increasing the speed of his or her lead horse during the return to the stable would cause other horses in the group to do the same, thereby endangering riders not forewarned. Keeping in mind that the question is simply whether respondent has shown, on the basis of undisputed material facts, that appellant cannot prove Wimple's conduct was "reckless" within the meaning of *Knight* and its progeny, all we decide is that respondent has failed to make the necessary showing and appellant therefore cannot be denied the right to present her case to a trier of fact. Whether Wimple's conduct was so reckless as to be totally outside the ordinary activity depends on the resolution of disputed material issues of fact and an examination of the totality of relevant circumstances. (See *Galardi v. Seahorse Riding Club* (1993) 16 Cal.App.4th 817, 823 [20 Cal.Rptr.2d 270] [evidence presented "created a question of fact concerning whether defendants, who, we may infer, had knowledge and experience concerning the sport of horse jumping superior to that of plaintiff, negligently deployed the jumps at unsafe heights or intervals and thereby breached the duty owed to plaintiff"].)

■ As indicated, application of the defense of primary assumption of risk is amenable to resolution by summary judgment because it turns on the question of legal duty. "The existence of a duty is not an immutable fact of nature, but rather an expression of policy considerations providing legal protection." (*Shin v. Ahn, supra,* 42 Cal.4th at p. 488.) In the sports context, "the nature of a defendant's duty . . . depends heavily on the nature of the sport itself." (*Knight, supra,* 3 Cal.4th at p. 317.) "[T]he object to be served by the doctrine of primary assumption of risk in the sports setting is to avoid recognizing a duty of care when to do so would tend to alter the nature of an active sport or chill vigorous participation in the activity." (*Kahn, supra,* 31 Cal.4th at p. 1011.) Nowhere, either in its pleadings below or in its brief in this court, does respondent claim that the duty of care appellant asserts would materially alter the nature of recreational trail riding or chill vigorous participation in that activity,[7] and we do not think such a duty of care would have either effect. Nor has respondent argued that operators of recreational

---

[7] With respect to the doctrine of primary assumption of risk, respondent's motion for summary judgment rested on little more than the statements that "[b]ecause a fall from a horse on a trail ride is a risk inherent in the sport, FIVE BROOKS does not owe Plaintiff a duty to reduce or remove that risk of harm. Horse riding is an active sport with inherent dangers, including unpredictable behavior by the horse, which, by their nature, are difficult to control, and even afternoon trail ride on back of walking horse has inherent risk of injury [*sic*]. ([*Harrold, supra,*] 19 Cal.App.4th 578, 587.)"

horseback riding facilities or those who use such facilities, many of whom are unskilled, consider the risks inherent in trail riding to include the danger that a supervising trail guide may unexpectedly provoke horses in his or her group to suddenly jump from a walk to a canter or gallop without notice to their riders. If such conduct was considered an integral part of the activity, a stable operator would be immune from liability if its trail guide suddenly whipped or threw a lit firecracker under the horse of an unsuspecting rider. No policy considerations justify such a result. As stated by Chief Justice George in his plurality opinion in *Knight, supra,* 3 Cal.4th 296, and reiterated by Justice Mosk in his opinion for a unanimous Supreme Court in *Neighbarger v. Irwin Industries, Inc.* (1994) 8 Cal.4th 532 [34 Cal.Rptr.2d 630, 882 P.2d 347], " 'it is thoroughly unrealistic to suggest that, by engaging in a potentially dangerous activity . . . , an individual consents to (or agrees to excuse) a breach of duty by others that increases the risks inevitably posed by the activity . . . itself, even where the participating individual is aware of the possibility that such misconduct may occur.' " (*Neighbarger,* at p. 537, quoting *Knight,* at p. 311.)

If summary judgment was properly denied in *Shin v. Ahn, supra,* 42 Cal.4th 482, because there was a triable issue as to whether the defendant golfer adequately looked to see whether the area directly ahead of him was clear before taking his shot, and his "recklessness" therefore could not be determined as a matter of law, summary judgment should, a fortiori, not have been granted in this case.

## DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings consistent with this opinion. Costs on appeal are awarded to appellant.

Richman, J., concurred.

**HAERLE, J.,** Dissenting.—I respectfully dissent for two reasons. First, I become concerned when an opinion of this court devotes as substantial an amount of space as the first part of the majority's opinion does to citing, but then distinguishing, prior published opinions of both our sister courts and our Supreme Court. By my estimation, the majority devotes well over half of that portion of its opinion to distinguishing cases going the opposite way from its ruling. In any event, I find the holdings in those cases more compelling than the reasoning in the first part of the majority's opinion.

Second, I am even more troubled by the fact that the majority reverses the summary judgment granted by the trial court on the basis of a theory—that

respondent's agent's conduct was either intentional or reckless—never either pled or urged by appellant in the trial court much less argued in her briefs to us.

## I.

Probably the most obvious of the majority's extensive efforts to distinguish cases holding differently than it does involves *Benedek v. PLC Santa Monica* (2002) 104 Cal.App.4th 1351 [129 Cal.Rptr.2d 197] (*Benedek*). In the course of the majority's argument as to why the language of the instant release does not cover alleged negligence of the respondent, that case is cited many times and quoted extensively in several paragraphs. Possibly the key sentences in those paragraphs are these: "[U]nlike the release in *Benedek, supra,* 104 Cal.App.4th 1351, the Release here does not exempt respondent 'from liability for *any* personal injuries suffered while on [respondent's] premises' " (maj. opn., *ante,* at p. 1490) whereas the release at issue in *Benedek* made clear that the defendant "cannot be held liable for *any and all risks* the releasor encounters while on the former's premises or using its facilities." (Maj. opn., *ante,* at p. 1491.)

But a commonsense approach, as opposed to a "Charybdis of completeness" approach allegedly rejected by the majority (*National and Internat. Brotherhood of Street Racers, Inc. v. Superior Court* (1989) 215 Cal.App.3d 934, 937 [264 Cal.Rptr. 44]; see maj. opn., *ante,* at p. 1490),[1] compels the conclusion that *both* releases fall into the same camp: without using the term "negligence," they nonetheless come within the rule that broad language describing the risks encompassed by the release (or "Express Assumption of Risk" if one prefers—see 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1346, pp. 756–757) means that it covers the alleged negligence of the defendant. *Benedek* summarizes the law on this point thusly: "An act of negligence is reasonably related to the object or purpose for which the release was given if it is included within the express scope of the release. [Citation.] Thus, a release given in connection with parachuting activities releasing the releasee 'forever,' unlimited by time and place, and containing no exceptions, was applicable to injuries incurred while parachuting three years after the release was signed and in a different location than where the activities covered by the release originally began. [Citation.] In addition, a release given in connection with scuba diving activities was applicable to the death of a scuba diving student who was inadequately supervised and who

---

[1] Although citing this case, the majority then attempts to distinguish it, too. (Maj. opn., *ante,* pp. 1489–1491.) And that decision is not the only one where a California appellate court has lamented exactly what was going on both there and, now, here: strained efforts to narrow the terms of a release/express assumption of risk document. (See also, to the same effect, *Randas v. YMCA of Metropolitan Los Angeles* (1993) 17 Cal.App.4th 158, 162 [21 Cal.Rptr.2d 245].)

drowned. [Citation.] Similarly, releases given in connection with fitness activities were applicable to injuries incurred while engaging in fitness activities. [Citations.]" (*Benedek, supra,* 104 Cal.App.4th at pp. 1357–1358; see also *id.* at p. 1356, fn. 1.)

The instant release/express assumption of risk did this by—among other phrases and provisions—the sentence reading: "I agree to assume responsibility for the risks identified herein *and those risks not specifically identified.*" It also did so, especially as applied here, by its earlier emphasis that "All horses . . . may and will . . . run and bolt uncontrollably. These actions may occur without warning and without apparent cause. They may be in response to external stimuli (such as . . . other horses . . .) . . . which may [lead] to some degree of reflex action on the part of the horse."

Despite all the effort the majority devotes to its attempt to distinguish *Benedek,* I simply do not understand how and why this language does not encompass defendant's alleged negligence in supervising horseback riders, but the very general language used in the *Benedek* release relieved a health club for negligence allegedly resulting when one of its television sets fell on a member.

Yet another case distinguished at length by the majority makes this point clear. In *Sanchez v. Bally's Total Fitness Corp.* (1998) 68 Cal.App.4th 62 [79 Cal.Rptr.2d 902] (*Sanchez*), our colleagues in the Second District affirmed a grant of summary judgment in favor of the defendant health club and against an allegedly injured patron of that club, who had signed an application for membership that contained a release/express assumption of risk clause which did not specifically use the term "negligence," but did provide that " ' "all exercises and use of the fitness centers are undertaken by the member at the sole risk of the member, and . . . the fitness center shall not be liable for any claims for injuries and damages whatsoever to person or property of the member . . . arising out of or connected with the use of the fitness center." ' " (*Id.* at p. 68.)

The appellant in that case contended this language did not cover injuries caused by the fitness center's negligence, but the court flatly rejected this argument: "Her contention that the absence of '[s]ome sort of verbiage, specifically describing in some adequate fashion the negligence of the defendant' renders the release invalid is nothing more than her insistence that the term 'negligence' or the specific incident of active or passive negligence must appear in the provision. That, however, is not the law. 'While it is true that the express terms of any release agreement must be applicable to the particular misconduct of the defendant [citation], that does not mean that every possible specific act of negligence of the defendant must be spelled out

in the agreement or even discussed by the parties.' [Citation.] Here the specific activity is sufficiently described by the terms of the release and assumption of risk provision by reference to 'injuries . . . arising out of or connected with the use of the fitness center.' " (*Sanchez, supra,* 68 Cal.App.4th at pp. 68–69.)

I conclude on this point by reiterating that I find no commonsense difference between a release/express assumption of risk (1) which covers "the risks identified herein [*including the risk that a horse 'may and will . . . run and bolt uncontrollably*'] and those risks not specifically identified" and (2) one which covers "*any and all risks* the releasor encounters while on the former's premises or using its facilities." (Maj. opn., *ante,* at p. 1491.) Notwithstanding its extended effort to distinguish these two formulations, I respectfully submit that the majority also fails.[2]

## II.

Although much of part II of the majority's opinion also involves attempts to distinguish several cases,[3] any discussion of those efforts is unnecessary. This is so because the majority's conclusion that the primary assumption of risk doctrine is inapplicable here is, I believe, wrong for two reasons: (1) nowhere in either its complaint or its pleadings in opposition to respondent's motion for summary judgment does appellant either allege, argue, or present factual evidence showing intentional or reckless behavior by respondent or its employee and (2) contrary to the majority's analysis, recklessness is not a subpart of negligence and, thus, allegations of and argument regarding the negligent behavior of a defendant cannot establish intentional or reckless behavior. I will discuss these points in that order.

### A. *The lack of any "allegation" or proof of reckless conduct.*

The majority opinion says that, under the exception to the primary assumption of risk doctrine first articulated in *Knight v. Jewett* (1992) 3 Cal.4th 296, 320 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*), and applied by that same court in *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990 [4 Cal.Rptr.3d 103, 75 P.3d 30] (*Kahn*) and *Shin v. Ahn* (2007) 42

---

[2] Probably the clearest example of this failure is the majority's impenetrable footnote 2, which is apparently an attempt to respond to the point I make above. However, I respectfully submit that that footnote does not identify any commonsense difference between formulations (1) and (2) above.

[3] See, e.g., *Harrold v. Rolling J Ranch* (1993) 19 Cal.App.4th 578 [23 Cal.Rptr.2d 671] and *Delaney v. Baker* (1999) 20 Cal.4th 23 [82 Cal.Rptr.2d 610, 971 P.2d 986] (*Delaney*). But perhaps of more significance are the many cases I rely upon in this section of my dissent which the majority opts to ignore. (See fns. 4, 5 and 7, *post.*)

Cal.4th 482 [64 Cal.Rptr.3d 803, 165 P.3d 581] (*Shin*), it is possible that the conduct of respondent's trail guide in this case was " 'reckless in the sense that it is "totally outside the range of the ordinary activity" [citation] involved in teaching or coaching the sport.' " (Maj. opn., *ante*, at p. 1493, quoting *Kahn, supra*, 31 Cal.4th at p. 996.) (See also *Shelly v. Stepp* (1998) 62 Cal.App.4th 1288, 1294–1295 [73 Cal.Rptr.2d 323], applying the "intentional or reckless" standard to a case involving horseback riding.)

The first problem with this is that nowhere in either her complaint, her other pleadings in the trial court, or her briefs to this court does appellant come within the proverbial country mile of alleging that any action taken by respondent or any of its staff was "reckless" or anything close to it. And, under the authority principally relied upon by the majority, *Kahn*, *both* an allegation and plausible evidence of "recklessness" or intentional misconduct is an essential to liability in a case such as this.

In *Kahn*, our Supreme Court made clear that, unless an allegedly injured plaintiff both pleads and proves intentional or "reckless" conduct by the defendant or its agent, the doctrine of primary assumption of risk applies. It stated: "These cases appropriately reason that, even keeping in mind the role of the coach or sports instructor, the imposition of a duty to avoid challenging a student to perform beyond his or her current capacity would have a chilling effect on the enterprise of teaching and learning skills that are necessary to the sport. These decisions properly emphasize that a coach or athletic instructor must challenge his or her students, and that learning itself can be a risky process, sometimes unavoidably so. These cases also properly recognize that while a student is engaged in the process of learning, he or she frequently is at greater risk than a proficient athlete would be, and a coach does not have a duty to eliminate all the risks presented by inexperience. [¶] We agree that the object to be served by the doctrine of primary assumption of risk in the sports setting is to avoid recognizing a duty of care when to do so would tend to alter the nature of an active sport or chill vigorous participation in the activity. This concern applies to the process of learning to become competent or competitive in such a sport. Novices and children need instruction if they are to participate and compete, and we agree with the many Court of Appeal decisions that have refused to define a duty of care in terms that would inhibit adequate instruction and learning or eventually alter the nature of the sport. Accordingly, we believe that the standard set forth in *Knight, supra*, 3 Cal.4th 296, as it applies to coparticipants, generally should apply to sports instructors, keeping in mind, of course, that different facts are of significance in each setting. *In order to support a cause of action in cases in which it is alleged that a sports instructor has required a student to perform beyond the student's capacity or without providing adequate instruction, it must be alleged and proved that the instructor acted with intent to cause a student's injury or that the instructor acted recklessly in the sense that the instructor's*

*conduct was 'totally outside the range of the ordinary activity'* [citation] *involved in teaching or coaching the sport."* (*Kahn, supra,* 31 Cal.4th at pp. 1010–1011, italics added; see also *Knight, supra,* 3 Cal.4th at pp. 318–320; *Shin, supra,* 42 Cal.4th at pp. 488–491, 497; *Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1068 [68 Cal.Rptr.2d 859, 946 P.2d 817]; *Bushnell v. Japanese-American Religious & Cultural Center* (1996) 43 Cal.App.4th 525 [50 Cal.Rptr.2d 671] (*Bushnell*).)

Unfortunately, the majority rather conspicuously does not address the very specific and unambiguous holding italicized above. To be sure, later in *Kahn,* the court made clear that the complaint itself need not include a specific allegation of "recklessness" *if* the plaintiff "adequately alleged facts and produced evidence sufficient to support such a conclusion." (*Kahn, supra,* 31 Cal.4th at p. 1013, fn. 4.) But, a fortiori, if the plaintiff does not do so, rather clearly the allegations of the complaint are, indeed, significant.

Two Court of Appeal cases, both cited and quoted approvingly in *Kahn,* confirm that an allegation of negligence in a complaint is *not* the same as an allegation of reckless or intentionally harmful conduct and cannot be converted into one. (See *Bushnell, supra,* 43 Cal.App.4th at pp. 533–535 and *Allan v. Snow Summit, Inc.* (1996) 51 Cal.App.4th 1358, 1371 [59 Cal.Rptr.2d 813] (*Allan*).) This principle is especially applicable where there is an "utter absence in the moving papers of any *evidence* of 'intentional misconduct or recklessness on the part of the instructor.' " (*Allan, supra,* at p. 1371, quoting *Bushnell, supra,* at p. 534.)[4] And it is noteworthy that our Supreme Court quoted approvingly from *Allan* in *Kahn,* where it specifically noted that summary judgment was properly sustained in *Allan* on the basis of "*the facts alleged in the case before it."* (*Kahn, supra,* 31 Cal.4th at p. 1009, italics added.)

Nor could appellant have amended her complaint at the summary judgment stage. In *Distefano v. Forester* (2001) 85 Cal.App.4th 1249 [102 Cal.Rptr.2d 813], our colleagues in Division One of the Fourth District affirmed a grant of summary judgment in favor of a defendant in a primary assumption of risk case involving an off-road collision between a motorcyclist and a dune buggy. In a part of its opinion entitled—significantly at least to me—"Intentional or Reckless Conduct Not Pleaded," the court wrote: "For purposes of determining whether Forester met his burden of establishing by undisputed facts his primary assumption of the risk defense under the *Knight* rule, our

---

[4] Neither *Bushnell* nor *Allan* is mentioned by the majority. This is particularly troublesome because both cases are discussed approvingly in *Kahn* (see *Kahn, supra,* 31 Cal.4th at pp. 1007–1010), and one of the holdings of *Allan* is that a pleading of negligence cannot be interpreted as a pleading of recklessness. (See *Allan, supra,* 51 Cal.App.4th at p. 1371; see also *Bushnell, supra,* 43 Cal.App.4th at pp. 533–535.)

next inquiry is whether there is evidence that he intentionally injured Distefano or engaged in conduct that was so reckless as to be totally outside the range of the ordinary activity involved in the sport of off-roading. [Citation.] The record shows that Distefano did not argue in the summary judgment proceedings (nor does he argue on appeal) that Forester intentionally injured him. Distefano does not allege in his form complaint that Forester's conduct was intentional or reckless. His pleading alleges only that Forester '*negligently*, carelessly and imprudently' operated his dune buggy. (Italics added.) Ordinary negligence is thus the only standard pleaded. As already discussed, under the *Knight* rule a participant who is injured in a sporting activity may not sue another participant for mere negligence. [Citation.] [¶] In its written decision, the court noted Distefano's failure to plead in his complaint that Forester's conduct was reckless. On appeal, Distefano contends that case law would permit an amendment to his complaint to conform to proof, and the court erred by not considering his allegations outside his complaint that Forester's conduct was reckless and increased the risks to Distefano over and above those inherent in recreational off-road activity. We reject these contentions. To create a triable issue of material fact, the opposition evidence must be directed to issues raised by the pleadings. [Citation.] If the opposing party's evidence would show some factual assertion, legal theory, defense or claim not yet pleaded, that party should seek leave to amend the pleadings before the hearing on the summary judgment motion. [Citations.] Distefano does not assert on appeal, nor does the record show, that he sought leave to amend his complaint before the hearing on Forester's summary judgment motion." (*Id.* at pp. 1264–1265.)

Similarly, in *Peart v. Ferro* (2004) 119 Cal.App.4th 60 [13 Cal.Rptr.3d 885], our colleagues in Division Three of this district affirmed a grant of summary judgment in a primary assumption of risk case involving the collision of watercraft. In so doing, they rejected an argument that the defendant was (as Wimple clearly was here) a coach or instructor, but in the process stated: "Even if he could be construed as such . . . there would still be no basis for imposing liability on him in the absence of *factual allegations and evidence* showing that Ferro had acted recklessly or intentionally in such a way as to increase the risk of harm beyond those already inherent in the sport. [Citations.] [¶] Here, appellants failed to allege recklessness in their complaint. Neither have they adduced any specific evidence of intentional or reckless actions on the part of Ferro . . . that actually increased the risks inherent in operating a Sea-Doo sufficient to demonstrate a triable issue of material fact as to the applicability of the primary assumption of risk doctrine to this case." (*Id.* at pp. 76–77, italics added.)[5]

---

[5] Neither *Distefano* nor *Peart* is cited or discussed by the majority.

The majority's argument also fails if one looks only at the evidence adduced by appellant in opposition to respondents' motion for summary judgment. The documents filed by appellant in the trial court opposing respondent's motion for summary judgment do not come close to alleging the sort of "reckless" or intentional behavior required to trigger this exception to the primary assumption of risk doctrine. In appellant's extensive pleadings to the trial court opposing respondent's motion for summary judgment, there is no suggestion whatsoever of "conduct that was so reckless as to be totally outside the range of the ordinary activity involved" in horseback riding. (*Shin, supra,* 42 Cal.4th at p. 488.) Indeed, appellant's briefing to the trial court is quite to the contrary. Thus, in her memorandum of points and authorities in opposition to respondent's motion for summary judgment, appellant summarizes the applicable law without even hinting at the concept of "reckless or intentional" conduct: "[T]he law is well defined that Defendant and its employee had a *duty to avoid such conduct such as taking off at a gallop without warning or provocation and to conduct the trail ride in a manner so as to protect plaintiff against a particular risk of harm that caused her injury, i.e. falling off her horse.*" (Italics added.) And, at the end of that memorandum of points and authorities, her contentions are summarized thusly: "Therefore, defendant and its employees owed a duty to avoid an unreasonable risk of injury to Plaintiff and to assure that the ride was not beyond the capability of Susan Cohen and her horse."

Finally, in appellant's 17-page combined response to respondent's statement of undisputed material facts and "Plaintiff's Additional Material Facts," there is, again, no allegation, mention, or even hint of "reckless" behavior on the part of respondent or its riding instructor-guide, Wimple. Thus, whether one considers (1) appellant's complaint, (2) her opposition to the motion for summary judgment, (3) the evidence adduced by her to support that opposition, or (4) a combination of all three, the result is the same: under the principles articulated in *Kahn,* reemphasized in *Shin, Peart,* and other post-*Kahn* cases, there are simply no "allegations" *or* evidence of "reckless" or intentional misconduct.[6]

---

[6] The majority interprets my "main objection" to be that "appellant has failed to show the necessary 'recklessness.' " (Maj. opn., *ante,* at p. 1496.) It then expands on this characterization a page later when it says that I place "the burden on appellant to persuade the court respondent has no such defense" rather than "asking whether respondent has established, as a matter of undisputed fact, 'either that one or more elements of the cause of action cannot be established . . . .' " (Maj. opn., *ante,* at pp. 1496–1497.) Both statements completely miss the mark: the core of my position is the express holding of *Kahn*—a holding that, as noted above, is inexplicably never even mentioned by the majority—that "it *must be alleged and proved* that the instructor acted with intent to cause a student's injury or that the instructor acted recklessly . . . ." (*Kahn, supra,* 31 Cal.4th at p. 1011, italics added.) Footnote 4 of *Kahn* makes clear (as also noted earlier) that such "allegations" need not be in the complaint. (*Id.* at p. 1013, fn. 4.) But clearly such allegations have to be somewhere in the record in the trial court, and

Appellant's briefs to this court are to the same effect. In her opening brief to us, the issue of primary assumption of risk is not addressed for the reason that the trial court granted summary judgment based on appellant's execution of the release/express assumption of risk document. But respondent advances that argument in its brief to us as an alternative basis for affirmance of the summary judgment. There, it quotes *Kahn* to the effect that "a participant breaches a duty of care to a coparticipant only if he or she 'intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport.' " (*Kahn, supra,* 31 Cal.4th at pp. 995–996.) This point is repeated several times later in that brief, and the brief concludes with a three-page section entitled "Nothing in the Pleadings or Record Indicate that Mark Wimple was Grossly Negligent or Reckless."

In her reply brief to us, appellant discusses none of the cases cited in that section (also cited and discussed below), nor the intentional or reckless behavior standard mandated by *Knight, Kahn* and subsequent authority. Indeed, the only use there of the word reckless appears in a single quotation from *Kahn* in that brief. But, even then, appellant continues to assert that the only issue regarding primary assumption of risk is "whether Mark Wimple, the trail guide, increased the risk of horse back riding by his actions" and: "Appellant is claiming that the actions of Respondent's employee, Mark Wimple, made it more likely that she would be thrown form her horse by taking off unexpectedly on his horse without warning the riders." Neither the words nor the concepts of reckless or intentional conduct are referenced in the slightest.

In summary, nowhere in either (1) her complaint in the trial court, (2) her opposition to respondent's motion for summary judgment, or (3) her briefs to this court does appellant *even hint* that the conduct of Wimple was either intentional or reckless. But the majority ignores these failures and reverses the trial court's grant of a summary judgment based on a legal theory never suggested by her either there or here.

B. *"Recklessness" is not the same as "negligence."*

But there is an additional reason why summary judgment should be affirmed: contrary to the majority's view, our Supreme Court has made clear—even before *Kahn*—that "recklessness" is not a subpart of "negligence." In *Delaney, supra,* 20 Cal.4th 23, the court explained: " 'Recklessness' refers to a subjective state of culpability greater than simple negligence,

they are most certainly not in this record before us. Secondly, there was no "proof" of such behavior in the record. Thirdly and finally, and as also noted above, appellant clearly did not understand the standard mandated by *Kahn* when it came time to write and file her briefs with this court.

which has been described as a 'deliberate disregard' of the 'high degree of probability' that an injury will occur [citations]. *Recklessness, unlike negligence*, involves more than 'inadvertence, incompetence, unskillfulness, or a failure to take precautions' but rather rises to the level of a 'conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it.' (Rest.2d Torts, § 500, com. (g), p. 590.)" (*Delaney, supra,* 20 Cal.4th at pp. 31–32, italics added.)

Section 500 of the Restatement Second of Torts, cited in *Delaney*, reads as follows: "The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk *is substantially greater than that which is necessary to make his conduct negligent.*" (Rest.2d Torts, § 500, italics added.)

Comment g to section 500 of the Restatement Second of Torts is entitled, significantly: "Negligence and recklessness contrasted." (Italics omitted.) It reads, in full: "*Reckless misconduct differs from negligence in several important particulars.* It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man. It differs not only from the above-mentioned form of negligence, but also from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent. The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind." (Rest.2d Torts, § 500, com. g, p. 590, italics added.)

I respectfully submit that the text of this comment, cited and relied upon by our Supreme Court a little over a decade ago, undermines the majority's premise that a tort case pled and argued both in the trial and appellate courts on a theory of ordinary negligence can and should be treated as if it had been based on "recklessness."

Further, even before *Delaney*, a panel of Division Four of this court applied the principle articulated there to a case involving primary assumption

of risk. In *Stimson v. Carlson* (1992) 11 Cal.App.4th 1201 [14 Cal.Rptr.2d 670] (*Stimson*), that court affirmed a summary judgment granted to a defendant boat owner in a personal injury action brought by a member of his sailing crew who was injured when hit by the mainsheet of the defendant's boat while sailing on San Francisco Bay. But the plaintiff in that case had alleged only negligence, which that court held was insufficient. Justice Reardon wrote for a unanimous court: "Failing to call out course changes does not amount to intentional or reckless conduct. *Stimson alleged that Carlson was negligent, not that he committed an intentional tort.* Carlson's failure to declare a course change before executing it was not so reckless as to be totally outside the range of ordinary activity involved in the sport. [Citing *Knight*.] While his conduct was unexpected, it did not alter the fundamental risk of sailing—the boom and its sheets remained the danger. Therefore, Carlson's conduct did not breach any legal duty to Stimson, the case falls within the primary assumption of the risk doctrine barring Stimson's action, and the trial court properly granted Carlson's motion for summary judgment." (*Id.* at p. 1206, italics added.)

Since *Delaney,* a panel of the Third District has specifically applied that case's definition of "recklessness" to another primary assumption of risk case. In *Towns v. Davidson* (2007) 147 Cal.App.4th 461, 470–473 [54 Cal.Rptr.3d 568] (*Towns*), that court held that a trial court was correct in granting summary judgment to a ski resort and one of its employees who had been sued by a skier who had collided with the employee on one of the resorts slopes. After quoting exactly the same passage as appears above from *Delaney,* the court held: "To establish Davidson's conduct was reckless and not shielded by primary assumption of risk, plaintiff must show the conduct was 'so reckless as to be totally outside the range of the ordinary activity involved in the sport.' [Citing *Knight*.] ' "[C]onduct is totally outside the range of ordinary activity involved in the sport (and thus any risks resulting from that conduct are not inherent to the sport) if the prohibition of that conduct would neither deter vigorous participation in the sport nor otherwise fundamentally alter the nature of the sport." [Citations.]' [Citation.]" (*Towns, supra,* at p. 470.)[7]

---

[7] Neither *Stimson* nor *Towns* is cited or discussed by the majority, an omission perhaps 50 percent attributable to the fact that *Towns,* contrary to the majority's statement in its footnote 6, relied on *Delaney*'s definition of "recklessness" in affirming the summary judgment in the primary assumption of risk case before it. (*Towns, supra,* 147 Cal.App.4th at p. 470.)

Thus, for two separate and independent reasons, I believe that the trial court's decision was correct, and that we should affirm its order granting summary judgment.