Filed 12/4/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MICHAEL SZAROWICZ,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>JEREMY BIRENBAUM,<br><br>     Defendant and Respondent. | A156312<br><br>(San Francisco County<br>Super. Ct. No. CGC-17-560825) |

       Plaintiff Michael Szarowicz was a recreational ice hockey player in a no-check league.  He brought this action for negligence and intentional tort against fellow recreational ice hockey player Jeremy Birenbaum after a violent, on-ice collision between the two left Szarowicz with serious injuries.  Birenbaum moved for summary judgment based on the primary assumption of risk doctrine.  The trial court granted his motion, concluding checking is an inherent risk of the game and the doctrine barred Szarowicz from recovering damages for his injuries.  Our de novo review leads us to conclude that summary judgment was error because a triable issue of material fact exists as to whether Birenbaum breached a limited duty of care owed to Szarowicz not to increase the risks to him over and above those inherent in the game.  We thus reverse the summary judgment.

       Birenbaum also moved for summary adjudication of Szarowicz's cause of action for intentional tort and his prayer for punitive damages.

Although the trial court did not address summary adjudication in light of the summary judgment, we do so on our de novo review. And we deny Birenbaum's motions, concluding Szarowicz's evidence raised triable issues of material fact as to both his intentional tort claim and his prayer for punitive damages.

## BACKGROUND

On August 18, 2017, Michael Szarowicz initiated this action against Jeremy Birenbaum. As twice amended, Szarowicz's complaint alleged two causes of action. The first, for intentional tort, alleged that during a "no-contact recreational" ice hockey game, Birenbaum intentionally harmed him when "without provocation [he] maliciously charged and illegally body-checked Plaintiff Michael Szarowicz after taking six full speed strides, blind-siding and knocking him into the air and then onto the ice, causing him to lose consciousness" and suffer "severe injuries." The second, for negligence, contained the same allegations, absent the allegations of intent to harm and malice. Szarowicz sought compensatory and punitive damages.

After filing his answer, Birenbaum moved for summary judgment or, in the alternative, summary adjudication, based on the primary assumption of risk doctrine recognized in *Knight v. Jewett* (1992) 3 Cal.4th 296 (*Knight*). There, a plurality held that the primary assumption of risk precludes liability for injuries resulting from risks deemed inherent in a sport. (*Id.* at pp. 315–316.) Birenbaum argued that checking is an inherent risk in the sport of no-check ice hockey and thus he did not owe Szarowicz a duty to protect him from injuries resulting from a check. Relying on *Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148 (*Avila*), he contended this was true even if

2

his conduct was intentional.  Birenbaum alternatively sought summary adjudication of the intentional tort cause of action based on *Avila*, and also of the prayer for punitive damages, on the ground there was no clear and convincing evidence he acted with malice or oppression in causing Szarowicz's injuries.

Szarowicz filed opposition to Birenbaum's motion.  He countered that under *Knight* and its progeny, including *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990 (*Kahn*) and *Shin v. Ahn* (2007) 42 Cal.4th 482 (*Shin*), there was a triable issue of material fact as to whether Birenbaum intentionally injured him or engaged in reckless conduct that was totally outside the range of the ordinary activity involved in no-check hockey, in which case the primary assumption of risk doctrine would not preclude liability.

The evidence submitted in support of and opposition to Birenbaum's motion included video footage of the incident[1] and declarations with exhibits that included excerpts of deposition testimony and discovery responses.[2]  The evidence revealed the following facts:

In 2017, Szarowicz and Birenbaum were both members of the San Francisco Adult Hockey League (SFAHL), an adult, recreational, no-check ice hockey league.  On January 30 of that year, at the Yerba Buena Ice Skating and Bowling Center (Yerba Buena), they were playing on opposing teams in game three of the three-game SFAHL

---

[1] The video submissions included a 12-minute recording of a portion of the game that showed the collision and a 12-second clip that showed the few seconds preceding the collision, the collision, and a few seconds after the collision, close up and in slow motion.  The game was recorded by a camera mounted behind one of the goals.

[2] Both sides also submitted objections to evidence, none of which the trial court ruled on.

championship series, Szarowicz for the Icehounds, Birenbaum for the Thousand Eyes. The teams were playing in Yerba Buena's C league, with A being the highest skill level and D the lowest.

In the final minutes of the game, with the Icehounds up five goals to two, the puck was hit laterally across the ice towards the players' bench. Szarowicz followed the puck across the ice, while Birenbaum, who had been defending the Thousand Eyes' goal, took at least six full strides parallel to the side of the rink along the players' bench. The puck ricocheted off the board on the right side, and Szarowicz intended to "[k]ind of slap it down" towards the Thousand Eyes' goal so one of his offensive teammates could shoot. Just as he was about to make contact with the puck, or was in fact making contact with it, Birenbaum collided with him, propelling him into the air, causing him to fall to the ice.

Szarowicz was briefly knocked unconscious but was eventually able to get up and leave the ice with assistance. He sat on the bench "kind of doubled over" and "having a hard time moving" until the end of the game, when he was taken to the hospital. He suffered extensive injuries, including six broken ribs, a dislocated shoulder with three fractured bones, a torn rotator cuff, a fractured sternum, a fractured scapula, and a collapsed lung.

Both sides submitted excerpts of Szarowicz's deposition testimony, which included the following:

Szarowicz began playing hockey in 1980 when he was four years old. He played in "village hockey leagues" until age 10, and then played travel and high school hockey from ages 10 to 18. During his college years, he took a hiatus from the sport, but resumed playing in 2000 or 2001 when he began playing recreational, no-check hockey. In 2014, he

4

moved to San Francisco and played first in a league in Oakland and then also joined the SFAHL. He had played an estimated 2,000 games and described his skill level for the Bay Area adult recreational leagues as "average." With the exception of one season, all of his experience playing adult hockey was in no-check leagues. He had also been a referee for five years.

In his many years of playing hockey, Szarowicz had witnessed player-to-player collisions. He had only seen players break bones in check hockey games, and he did not think he had seen concussions in the adult leagues. While playing no-check hockey, the worst injuries he suffered were "[b]umps and bruises," with a sprained knee on one occasion.

Szarowicz acknowledged that the SFAHL rules state, "The SFAHL is a non-check league, but ice hockey is a contact sport." He agreed ice hockey is a contact sport and it would be very difficult to play without any contact. The SFAHL rules provide graduated penalties for varying degrees of checking, as well as penalties for other forms of contact, like kneeing, elbowing, charging, and head-butting. According to Szarowicz, physical contact in a game does not necessarily result in a penalty, and once or twice a game there would be physical contact that did not result in a penalty.

As to the January 30, 2017 game, Szarowicz initially testified that he did not recall any contact or communication with Birenbaum prior to the collision. After a break in his deposition, he testified that his recollection had been refreshed by reviewing the pleadings in the case and he now recalled having seen Birenbaum crosscheck one of his

teammates, prompting Szarowicz to ask him "why he was so angry."[3] Later in the game, Birenbaum crosschecked Szarowicz by holding his stick horizontally and "he took it and kind of rammed it down into the back of my pants actually." Szarowicz did not say anything to Birenbaum or the referee, and no penalty was called.

Just prior to the collision, Szarowicz remembered "turning, going to turn up ice, and I remember hearing something and then I got hit and kind of blacked out for a bit and then was in a lot of pain on the ice and got off the ice." The sound he heard was someone skating "at a good pace . . . ." As can be seen in the video recording of the collision, while Birenbaum was skating towards Szarowicz, his stick was going up and down. When he made contact with Szarowicz, he lifted his shoulder and his stick came down, where it stayed after the collision.

Throughout his hockey career, Szarowicz had seen notices and had signed waivers warning of the risk of harm from ice hockey. He was aware USA Hockey recommends players wear protective gear, including shoulder pads, to minimize the risk of injury.

Szarowicz had never been told that Birenbaum said he wanted to harm him. He believed, however, that Birenbaum formed an intent to harm him when he took his first aggressive stride around his goalie. Asked if it was possible that Birenbaum was aggressively striding to where the puck was and was unaware of Szarowicz's location, Szarowicz responded, "I've played hockey for 30 years. I've been in at least 2,000 games. I know that is not even a reasonable play at that point.

---

[3] He described crosschecking as, "Took his stick in a position with two hands on it across his chest and pushed it into the other player, my teammate."

6

[¶] . . . [¶]  I know what he was trying to do.  Because I've seen hockey enough, I've watched hockey enough.  He wasn't trying to score a goal.  He was trying to hurt someone."  He also did not think Birenbaum was going after the puck because "[h]e didn't make a play on the puck.  He made a play on my body.  If he wanted to play the puck he wouldn't have gone after me in my opinion.  In addition, that skating style, that skating speed isn't a proven hockey play or effective" because he "could have poked the puck ahead and gone right around me but that was not his intent."[4]

Both parties submitted expert declarations.  Birenbaum's expert, Tyler Shaffar, had more than 25 years' experience as a hockey player and was the manager of hockey operations for the San Jose Sharks, a position he had held since 2003.  He had attended multiple seminars and training sessions sponsored by USA Hockey; was a board member of the California Amateur Hockey Association; held a coaching certification with USA Hockey; coached a San Jose Junior Sharks team; and was certified under USA Hockey's safe sport program.

Shaffar described ice hockey as a contact sport "known to be fast-paced and physical . . . ."  He explained that because it is "common for ice hockey players to come into physical contact with each other during the course of play . . . USA Hockey has defined the different types of physical contact that may occur during a game."  This includes "body contact," which is "contact that occurs between players during the normal process of play," and "checking," which is "deliberate contact

---

[4] In support of his motion, Birenbaum submitted a declaration generally describing the video footage of the incident.  He did not, however, testify regarding his conduct leading up to and at the time of the collision, including his intent as he skated towards Szarowicz.

7

made with an opposing player in the course of the game." According to Shaffar, "In a 'no-check' amateur league, 'no check' does not mean 'no contact,' and contact in a 'no-check' game can be very physical . . . . 'Body checking' is routine in an amateur hockey game, even in a 'no-check' league." He explained that in a no-check league, a referee may assess penalties for "body checking," with penalties ranging from a two-minute minor penalty to a match penalty, depending on the severity and intent. While the SFAHL describes itself as a "no-check" league, Shaffar believed "contact with other players should be expected as a normal part of play." According to Shaffar, this was confirmed by the SFAHL hockey rules, which state on the first page, "The SFAHL is a non-check league, but ice hockey is a contact sport."

Turning to the collision that resulted in Szarowicz's injuries, Shaffar opined that "Birenbaum's conduct, even if in violation of specific hockey rules, and even if intentional, is not totally outside the normal range of activity associated with the sport in a 'no-check' league." According to Shaffar, "In the fast paced and aggressive game of ice hockey, skaters can skate to speeds in excess of 20 mph. Where two players are both skating in the direction of a loose puck, player-to-player collisions can occur. To impose a rule or standard designed to deter a player from skating at full speed—because an opponent is going after a puck in the same area—and to avoid at all costs a potential collision, would fundamentally alter the sport of ice hockey, and chill vigorous participation." He believed Birenbaum's actions were consistent with advancement of the game and with what one would expect to see on that particular play.

Shaffar also opined that the collision was not "totally outside the normal range of the sport," stating: "Collisions of the nature involved in this case, one with sufficient force to propel a player into the air and then onto the ice, occur frequently. I personally have witnessed such types of collisions more than a hundred times in my career playing in, and overseeing, no-check leagues. Currently, in the no-check league I oversee, these types of collisions occurred at least monthly." According to Shaffar, "[T]he risks of colliding with another player in a typical ice hockey game, with sufficient force to be knocked onto the ice, are within the normal range of the sport of ice hockey at all levels, from junior to professional, including in no-check adult leagues. Even being *intentionally* hit, and even if prohibited by the applicable rules, is so customary that an intentional hit has its own terminology in hockey, employing such phrases as: 'he ran him,' 'he destroyed him,' 'he lit him up.'"

Shaffar further opined that the injuries Szarowicz suffered, while "serious and unfortunate," were "not totally outside the normal range in ice hockey competition, including in no-check leagues." In his opinion, "Because of the fast pace of hockey—and the objectives of the parties to take possession of the puck and score, or alternatively to deprive the opponent of puck possession and scoring opportunities—even serious injuries of the types involved in this case do occur and can be expected in hockey. Based upon my own personal experience, as well as the training I have received, some common injuries that occur from aggressive game play are lower back injury, neck injury, foot injury, head injury, black eye, broken teeth, cuts [and] bleeding, spinal cord injury and broken bones. Severe injuries occur even on legal plays,

9

whether players are skating at speeds in excess of 20 mph, or even when not skating fast." Shaffar believed that "the risk of incurring the type of injuries involved in this case cannot be eliminated entirely without fundamentally altering the fast pace and competitive nature that characterize the sport of ice hockey, even in no-check leagues."

In forming his opinions, Shaffar considered a number of written waivers, including those used by the SFAHL and the San Jose Sharks' amateur leagues, which disclose the risks of serious injury, and even death, that can occur in amateur hockey.

Szarowicz's expert, Russell Hughes, was a former Redwood City police officer and operated an adult hockey league in Cupertino called the Pacific Hockey Association (PHA). He had been involved in operating adult hockey leagues since 1983 and had played in those leagues and various tournaments for the past 36 years. In his capacity as the operator of the PHA, he had attended over 2,000 games. He had also been involved in the operation of adult ice hockey tournaments in other locations dating back to 1986, and in that capacity had played in over 300 games and observed another 1,300.

According to Hughes, ice hockey is played at "very different levels which involve dramatically different amounts of contact": full contact hockey, such as in professional leagues, intercollegiate hockey, and some amateur leagues, allows body checking, while recreational leagues are " 'no-check,' 'body-contact' leagues." As Hughes described it, "They are two different sports. Body checking is an essential part of competitive full contact hockey, whereas checking is prohibited in recreational hockey" and is not part of the sport. According to Hughes, "[A]lthough incidental contact is to be expected in no-check leagues, this contact is

10

not intentional, and participants are supposed to avoid contact when possible. There are far fewer injuries in no-check recreational hockey. Participants in adult no-check hockey leagues choose not to expose themselves to the types of injuries that are far more common in a competitive full contact league that allows body-checking." In his 36 years of recreational ice hockey experience, Hughes had never seen a player in an adult hockey league game sustain "anything even close to the injuries" Szarowicz sustained.

Hughes disagreed with Shaffer's opinion that Birenbaum's actions were " 'consistent with advancement of the game,' and were 'not totally outside the range of activity one would expect . . . in a no-check league.' " He had reviewed the video footage of the collision many times and saw "no indication from his skating, from the use of his stick, or from the use of his shoulder to hit Mr. Szarowicz, that Birenbaum was making a play on the puck." He described Birenbaum's hit on Szarowicz as "vicious and completely unnecessary," "violent and premediated," and at the very least "reckless and despicable." He stated that "[i]t is neither ordinary nor normal for a player to skate at full speed down the ice past teammates to hit a defenseless player from the side with the force that he did."

Hughes also disagreed with Shaffar's statement that "in the fast paced and aggressive game of ice hockey, skaters can skate to speeds in excess of 20 mph." According to Hughes, "It is very rare for a recreational hockey player to exceed 20 mph. Professional hockey and recreational adult hockey are like two different sports." He also disagreed that the incident was a "collision" because in hockey "the term 'collision' is generally used to refer to unintended incidental contact

11

between players. This injury resulted from a forceful and intentional check."[5]

Attached to Hughes's declaration was a letter from Yerba Buena adult hockey director Carlos Valdebenito, Jr., in which Valdebenito stated that he had been involved with the game of hockey since he was a child, had been the adult hockey director at Yerba Buena for nearly 10 years, and had "overseen literally hundreds of San Francisco Adult Hockey league games and ha[d] dealt with countless incidents . . . ." While he did not witness the incident between Birenbaum and Szarowicz, he had reviewed reports prepared by his co-workers and the video recording of the play at issue. According to Valdebenito, the play "would be considered a dangerous and illegal hit even by NHL standards, which is a full contact professional league," and Birenbaum "was suspended from the league because of his dangerous conduct. . . ." Hughes agreed with Valdebenito's assessment.

Szarowicz submitted a declaration in support of his opposition. In it, he disputed many of Birenbaum's purportedly undisputed material facts. Specifically:

"5. I disagree . . . that Defendant's conduct in striding fast toward the area where he collided with Plaintiff—as plaintiff either was about to hit, or was hitting, the puck—was consistent with advancement of the game. A defensive player skating at that pace into that area of

_____

[5] According to Hughes, "Shaffar plays in the top division of his league. This division includes a team that was so violent when they played in the PHA that they were banned. They renamed themselves as 'Blacklisted' as a badge of honor for being banned from the PHA for violent play. Also, periodically, former NHL players have done short stints in that division."

12

the ice is a highly unusual play by a defenseman and evidences that Defendant's intent was not the advancement of the game but rather to create a collision and injure Plaintiff.

"6.  I disagree . . . that Defendant's conduct leading up to the collision is not totally outside the bounds of the sport of ice hockey in a no-check league.  On the contrary, Defendant's conduct was not consistent with advancement of the game.  Defendant did not make a play on the puck or pursue any action that would have advanced the game.  Quite the contrary.  Defendant's conduct evidenced an intent to injure another player, or, at the very least, was reckless, evidencing a willful and wanton disregard for Plaintiff's safety.  Defendant's conduct was detrimental to the very nature of no-check hockey, which is designed for the added safety of the participants and to avoid serious injury.

"7.  I disagree . . . that 'intentional hits with sufficient force to propel a player into the air and then onto the ice, occur in no-check leagues, and are not totally outside the bounds of the sport.'  I have played in more than 500 adult non-check league games, and had never witnessed a collision with comparable force or intent to injure.  Prohibition of intentional hits with sufficient force to propel a player into the air and then onto the ice would not in any way discourage vigorous participation or otherwise fundamentally change the nature of no-check hockey.

"8.  I disagree with Defendant's Separate Statement of Undisputed Fact 21 in Issues 1 and 2 ['Intentionally-caused collisions are common enough that they have their own terminology in the sport of ice hockey'], if the word 'hockey' is being used to refer to no-check

13

recreational hockey. As stated by expert Russell Hughes, the sport of ice hockey is played at very different levels which involve dramatically different amounts of contact. The primary difference is that competitive full contact hockey—professional leagues, intercollegiate hockey, and some amateur leagues—allows 'body checking,' while recreational hockey leagues are 'no-check,' 'body-contact' leagues. They are two different sports. Body checking is an essential part of competitive full-contact hockey, whereas checking is prohibited in recreational hockey.

"9. I disagree . . . that the injuries suffered by Plaintiff are not totally outside the bounds of the sport of ice hockey, even in no-check leagues. I was told by treating physicians that my injuries were more consistent with those caused by a car accident than by participation in sports. As a hockey participant for 35 years and a referee I had never witnessed injuries of this severity caused by a hockey collision.

"10. I disagree . . . that 'Injuries of the types involved in this case occur and can be expected in hockey, even on legal plays, and whether a player is skating fast or not. These injuries were consistent with a brutal attack by someone intending to injure his opponent. This type of injury is not expected in recreational or even professional hockey. If this were to be expected, virtually no one would play hockey.

"11. I disagree . . . that 'Short of refraining from playing at all, the risk of incurring the type of injuries involved in this case cannot be eliminated entirely without substantially altering the fast pace and competitive nature that characterize the sport of ice hockey, even in no-check leagues.' Defendant acted with intent and despicable and reckless disregard for other players' safety. He was not going for the puck. He

was going for the player. His actions were not intended to further the game.

"12. I disagree with Defendant's Separate Statement of Undisputed Fact 42, in Issue 3 ['Plaintiff has no actual knowledge of Defendant's intent with regard to the subject collision']. Although I have not been told by Defendant of his intent, and cannot read his mind, Defendant's actions are evidence of his intent. His actions were inconsistent with the normal strategic play of a defenseman. His pace as he approached Plaintiff was too fast to play the puck. He drove his shoulder into the plaintiff and upwards. And he made no attempt to turn to his left and play the puck. These actions are all evidence of Defendant's intent to cause injury and of his despicable and reckless disregard for Plaintiff's safety."

Also supporting Szarowicz's opposition were excerpts of deposition testimony from three of his Icehounds teammates who were at the January 30, 2017 game:

Omar Akhtar had played in an estimated 2,000 ice hockey games, including full-contact hockey. He believed Birenbaum was intentionally physical with Szarowicz, and it appeared he was trying to hurt him. He considered it significant that Birenbaum was not reaching for the puck with his stick at the time of collision, which was consistent with someone who was bracing for a hit rather than inadvertently colliding with someone while going for the puck. In all of the games he had played, Akhtar had never seen injuries like those suffered by Szarowicz, and he disagreed with Shaffar's opinion that the injuries Szarowicz suffered were not totally outside the normal range suffered in no-check

15

ice hockey.  He believed eliminating this type of collision from no-check hockey would not fundamentally change the sport.

Alex Leveque had at least 23 years of experience playing ice hockey, including 11 years in adult leagues since graduating from high school.  As he described the collision, Szarowicz arrived at the puck and made a turn when Birenbaum "la[id] his body on him" and Szarowicz "drop[ped] pretty hard to the ground . . . ."  He had seen checks in no-check games, but "not like this," and he had never seen a collision of that magnitude in a no-check game.

Leveque testified that it seemed like Birenbaum was "going after" Szarowicz because if he had been going for the puck, he would have slowed down and gone for the puck.  Instead, he "[v]ery clearly" made no attempt to slow down before he hit Szarowicz.  In Leveque's words, "[A]t that time of the game, the situation we were in, he was clearly going to hit [Szarowicz] to hurt him.  He was looking for blood, he was pissed."  Leveque believed that even if Birenbaum had not intended to injure Szarowicz, by skating that fast and hitting him that hard, Birenbaum showed a willful and wanton disregard for Szarowicz's safety.

According to Leveque, checking is not to be expected in a no-check league, especially not an open ice hit, which he described as very unusual.  Asked whether collisions between players in no-check leagues were uncommon, he responded, "I'd say it's uncommon for two players going the opposite direction like this, you know, or opposing directions, it's pretty uncommon because there is no point to really hurt them unless you are going to hurt them.  If you are going into the corner side by side with a guy, there is bumping, grinding but nothing like open ice hit like this, as we call it."

16

Based on Leveque's 23 years of experience playing hockey, he believed prohibiting Birenbaum's conduct would not discourage vigorous participation in the sport of no-check hockey, especially since it was already prohibited.

Ken Bagchi had played hockey since he was young, including 15 years of ice hockey after college. Bagchi, who was the Icehounds' goalie during the January 30, 2017 game and observed the collision, had seen collisions and injuries in no-check leagues, but he had never seen injuries of this degree in his entire hockey career. According to Bagchi, "[T]he normal collisions that I see from two players going for a puck are more—they're more tangential contacts. Where both are angling towards a puck. They meet sort of in side by side." Birenbaum's hit, however, "was more straight on to Mr. Szarowicz" and his "trajectory was not angled towards the direction the puck was going." Bagchi believed that if Birenbaum was attempting to play the puck, "he would have gone more towards the boards and it would—there would have been a tangential collision between Mr. Szarowicz and Mr. Birenbaum." He provided further reason for his belief that Birenbaum was not attempting to play the puck: "[W]hen people incidentally collide, they're both playing for a puck. One is, they're both in a sense equally unprepared for collision. Mr. Birenbaum remaining standing lead[s] me to believe that he was much more prepared for the collision whereas Mr. Szarowicz collapsed and was unprepared for the collision."

Asked if a player taking as many strides as Birenbaum did and hitting another player who was unprepared for the collision was a reckless act, Bagchi answered, "I felt that that play was dangerous and unwarranted there. And a hockey play would have been to go for the

puck. I believe his trajectory was not consistent with what I considered to be hockey play which was the puck." Further, Birenbaum's contacted Szarowicz with "some upward angle of force," which was not "normal hockey play" and "was outside of the normal scope" of what he would expect in a no-check league.

**Trial Court's Order Granting Summary Judgment for Birenbaum**

On November 7, 2018, the trial court heard argument on Birenbaum's motion. That same day, it entered a written order, granting the motion, as follows:

"Defendant Birenbaum and Plaintiff Szarowicz collided on the ice during a San Francisco Adult Hockey League (SFAHL) championship game on January 30, 2017. Mr. Szarowicz contends that Mr. Birenbaum intentionally 'checked' him with an upward thrust of his right shoulder which knocked Mr. Szarowicz down to the ice. Mr. Szarowicz momentarily lost consciousness and sustained various injures. SFAHL is a 'no check' league where deliberate contact is not allowed. Rules in the league set forth graduated penalties for various degrees of checking. The game and the incident were recorded on video and viewed by the Court.

"Mr. Szarowicz filed this lawsuit against Mr. Birenbaum seeking damages based on claims of intentional tort and negligence. Liability may only be imposed on a sports participant when he 'intentionally injures another player or engages in reckless conduct that is totally outside the range of the ordinary activity involved in the sport.' (*Knight v. Jewett* (1992) 3 Cal.4th 296, 318.) As a matter of law, checking is an inherent risk that is not 'totally outside the range of the ordinary activity,' even in 'no-check' recreational ice hockey. Therefore,

18

primary assumption of risk bars Mr. Szarowicz's claims. Just as being intentionally hit by a pitch is an inherent risk of baseball, being intentionally 'checked' is an inherent risk in recreational ice hockey. (See *Avila v. Citrus Cmty. Coll. Dist.* (2006) 38 Cal.4th 148, 164 ('Being *intentionally* hit [with a pitch] is likewise an inherent risk of the sport, so accepted by custom that a pitch intentionally thrown at a batter has its own terminology: "brushback," "beanball," "chin music" ').) Even though checking is against the league rules and Mr. Birenbaum was penalized by the referee and the hockey league for his unusually forceful check on Mr. Szarowicz, violation of the rules of the sport does not justify imposition of legal liability that could deter athletes from vigorous participation that 'falls close to, but on the permissible side of, a prescribed rule.' (*Id.* at 165 (quoting *Knight*, 3 Cal.4th at 319).)"

Judgment for Birenbaum was entered on December 18, and this timely appeal followed.

## DISCUSSION

### Summary Judgment and the Standard of Review

"A defendant's motion for summary judgment should be granted if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)" (*Kahn*, *supra*, 31 Cal.4th at pp. 1002–1003.) A defendant meets "his or her burden of showing that a cause of action has no merit if the party has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto."

19

(Code Civ. Proc., § 437c, subd. (p)(2); see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.)

On appeal from a grant of summary judgment, we review the determination of the trial court de novo. (*Kahn, supra,* 31 Cal.4th at pp. 1002–1003; accord, *Shin, supra,* 42 Cal.4th at p. 499.) We strictly construe the moving party's papers and liberally construe the opposing party's papers. We resolve any doubts as to whether there is any triable issue of material fact in favor of the opposing party. (*Cohen v. Five Brooks Stable* (2008) 159 Cal.App.4th 1476, 1483 (*Cohen*).)

**Primary Assumption of Risk**

As a general rule, an individual has a duty to use due care to avoid injury to others and may be held liable if his or her careless conduct injures another person. (*Knight, supra,* 3 Cal.4th at p. 315; accord, Civ. Code, § 1714, subd. (a); *Shin, supra,* 42 Cal.4th at p. 488; *Rowland v. Christian* (1968) 69 Cal.2d 108, 112.) A plurality in *Knight* recognized an exception to that duty, known as the primary assumption of risk, which precludes liability for injuries arising from risks inherent in a given sport or recreational activity.[6] (*Knight,* at pp. 315–316.) A

---

[6] *Knight, supra,* 3 Cal.4th 296 involved a recreational touch football game. The principle has since been applied to a variety of sports and recreational activities. (See, e.g., *Nalwa v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148 (*Nalwa*) [bumper car rides]; *Shin, supra,* 42 Cal.4th 482 [recreational golf]; *Avila, supra,* 38 Cal.4th 148 [intercollegiate baseball]; *Kahn, supra,* 31 Cal.4th 990 [competitive swimming]; *Cheong v. Antablin* (1997) 16 Cal.4th 1063 [recreational skiing]; *Amezcua v. Los Angeles Harley-Davidson, Inc.* (2011) 200 Cal.App.4th 217 [group motorcycle rides]; *Calhoon v. Lewis* (2000) 81 Cal.App.4th 108 [skateboarding]; and *Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248 [commercial river rafting].)

majority of the Court has reaffirmed the doctrine on numerous occasions, including in *Cheong v. Antablin, supra,* 16 Cal.4th 1063, where it summarized the principles of *Knight* as follows:

"[In *Knight*], [w]e distinguished between (1) primary assumption of risk—'those instances in which the assumption of risk doctrine embodies a legal conclusion that there is "no duty" on the part of the defendant to protect the plaintiff from a particular risk'—and (2) secondary assumption of risk—'those instances in which the defendant does owe a duty of care to the plaintiff but the plaintiff knowingly encounters a risk of injury caused by the defendant's breach of that duty.' [Citation.] Primary assumption of risk, when applicable, completely bars the plaintiff's recovery. . . . Whether primary or secondary assumption of risk applies 'turns on whether, in light of the nature of the sporting activity in which defendant and plaintiff were engaged, defendant's conduct breached a legal duty of care to plaintiff.' [Citation.] The test is objective; it 'depends on the nature of the sport or activity in question and on the parties' general relationship to the activity' rather than 'the particular plaintiff's subjective knowledge and awareness . . . .' [Citation.]

"We noted that 'As a general rule, persons have a duty to use due care to avoid injury to others, and may be held liable if their careless conduct injures another person. [Citation.]' [Citation.] This general rule, however, does not apply to coparticipants in a sport, where 'conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself. . . . In this respect, the nature of a sport is highly relevant in defining the duty of care owed by the particular defendant. [¶] Although defendants generally have no

21

legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, . . . defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport. . . . [¶] In some situations, however, the careless conduct of others is treated as an "inherent risk" of a sport, thus barring recovery by the plaintiff.' [Citation.] Courts should not 'hold a sports participant liable to a coparticipant for ordinary careless conduct committed during the sport' because 'in the heat of an active sporting event . . ., a participant's normal energetic conduct often includes accidentally careless behavior. . . . [V]igorous participation in such sporting events likely would be chilled if legal liability were to be imposed on a participant on the basis of his or her ordinary careless conduct.' [Citation.]

"For these reasons, the general test is 'that a participant in an active sport breaches a legal duty of care to other participants—i.e., engages in conduct that properly may subject him or her to financial liability—only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport.' " (*Cheong v. Antablin*, *supra*, 16 Cal.4th at pp. 1067–1068.)

The question of duty is a question of law to be decided by the court. (*Knight*, *supra*, 3 Cal.4th at p. 313; *Kahn*, *supra*, 31 Cal.4th at p. 1004.) In the sports and recreational activities context, the question of which risks are inherent—and thus no general duty of care is owed— is also a question of law for the court. (*Nalwa*, *supra*, 55 Cal.4th at pp. 1158–1159; *Amezcua v. Los Angeles Harley Davidson, Inc.*, *supra*, 200 Cal.App.4th at p. 233.) "If a duty is found not to exist, primary

22

assumption of risk applies, and a defendant is liable only if he intentionally injures the plaintiff or engages in conduct so reckless as to be totally outside the range of the ordinary activity involved in the sport or activity." (*Saville v. Sierra College* (2005) 133 Cal.App.4th 857, 866.)

In sum and in short, the fundamental issues here are whether Birenbaum has shown that checking is an inherent risk of no-check hockey, and whether Szarowicz has demonstrated that there is a triable issue of material fact as whether Birenbaum increased the risk inherent in no-check hockey by intentionally injuring him or engaging in conduct so reckless as to be totally outside the range of the ordinary activity involved in no-check hockey.

### There Are Triable Issues of Material Fact as to Whether Birenbaum Increased the Risks Inherent in No-check Hockey

There is no dispute that recreational ice hockey falls within the scope of the primary assumption of risk doctrine. As such, Birenbaum did not owe Szarowicz a duty to prevent harm resulting from the risks inherent in the sport itself. (*Knight*, *supra*, 3 Cal.4th at pp. 315–316; accord, *Nalwa*, *supra*, 55 Cal.4th at pp. 1152, 1162; *Shin*, *supra*, 42 Cal.4th at p. 486; *Kahn*, *supra*, 31 Cal.4th at pp. 995–996.) Birenbaum argues that checking is an inherent risk in no-check hockey and he thus owed Szarowicz no duty to protect him from injuries suffered as a result of a check. Accordingly, he produced evidence— primarily, the declaration of expert Shaffar—demonstrating that checking is in fact an inherent risk in no-check hockey. Shaffar established that ice hockey is a fast-paced, contact sport; "no check" does not mean no contact; contact in a no-check game can be very physical; and checking is routine in no-check hockey. The trial court accepted

23

this account when it found that "checking is an inherent risk that is not 'totally outside the range of the ordinary activity,' even in 'no-check' recreational ice hockey." But that is as far as the trial court's findings went. There is no indication it considered the other side of the story, that is, Szarowicz's evidence that Birenbaum increased the risk to him over and above that inherent in the game.

As noted, a sports participant increases the risks inherent in the sport by intentionally injuring a coparticipant or by engaging in reckless conduct. (*Shin, supra,* 42 Cal.4th at p. 486.) With the deposition and declaration testimony of Hughes, Akhtar, Leveque, Bagchi, and himself, Szarowicz presented evidence from which a reasonable trier of fact could conclude that Birenbaum intentionally injured him or engaged in conduct that was so reckless as to be totally outside the range of the ordinary activity involved in no-check hockey. We need not reiterate that evidence in detail here, as we set it forth at length above. The essence of it, however, is that while an incidental check may occur in no-check hockey, a violent, high speed, open ice check on an unsuspecting opponent does not, and prohibiting such conduct—which is, in fact, already prohibited—would neither deter vigorous participation in the sport nor otherwise fundamentally alter the nature of the sport.

Szarowicz's evidence raised a material, disputed question: was Birenbaum attempting a legitimate hockey play, was his play reckless, or was he making a play on Szarowicz with the intent to harm him? If a jury were to find that Birenbaum intended to injure Szarowicz or that his violent, high speed, open ice check was totally outside the normal range of activity to be expected in no-check hockey and was thus reckless, it could find that he increased the risks inherent in no-check

24

hockey and his conduct could subject him to liability.  (See, e.g., *Shin*, *supra*, 42 Cal.4th 482 [triable issue whether golfer was reckless when he inadvertently pulled a shot to the left, injuring a fellow golfer]; *Kahn*, *supra*, 31 Cal.4th 990 [triable issue whether coach was reckless in the manner he trained a student swimmer who broke her neck diving into a shallow racing pool]; *Cohen*, *supra*, 159 Cal.App.4th 1476 [triable issue whether trail guide increased the risk to a horseback rider when he caused his horse to bolt knowing the horses behind him would follow]; *Vine v. Bear Valley Ski Co.* (2004) 118 Cal.App.4th 577, 591–592 [whether defendant's design of snowboard jump increased inherent risk of snowboarding was a question for the jury]; *Solis v. Kirkwood Resort Co.* (2001) 94 Cal.App.4th 354, 365 ["plaintiff produced facts from which a jury could find that defendant [ski resort] increased the risk of harm to skiers beyond those inherent in the sport"].)

Birenbaum dismisses the significance of Szarowicz's evidence, contending his " 'expert' opinions on the legal question of the inherent risks of the sport are irrelevant to the governing legal question and cannot defeat summary judgment."  In support, he relies on *Towns v. Davidson* (2007) 147 Cal.App.4th 461, where plaintiff was a recreational skier who was injured when she was hit by another skier.  (*Id.* at p. 465.)  In opposition to defendant's summary judgment motion, plaintiff submitted a declaration of an expert witness who opined that the collision was caused by defendant " 'skiing so reckless as to be well outside the range of the ordinary activity involved in the sport of skiing.' "  In granting summary judgment for defendant, the trial court excluded the declaration of plaintiff's expert witness in its entirety.  According to the Court of Appeal, which affirmed summary judgment,

25

the trial court did not abuse its discretion in excluding the expert declaration because "[a]lthough the expert's testimony may embrace an ultimate factual issue [citation], it may not contain legal conclusions." And, the court concluded, plaintiff's "expert added nothing beyond declaring the undisputed facts in his opinion constituted recklessness. In short, he 'was advocating, not testifying.' " (*Id.* at pp. 472–473.) That is not the situation here.

While the testimony Szarowicz submitted contained legal conclusions as to the nature of Birenbaum's conduct (e.g., that it was reckless), it also contained facts and opinions that were based on the witnesses' personal and extensive experience with the sport of ice hockey (e.g., that Birenbaum made no effort to play the puck), and it properly embraced ultimate factual issues (e.g., that Birenbaum's conduct was not consistent with advancement of the game and that prohibition of such conduct would neither deter vigorous participation in the sport not otherwise fundamentally alter the nature of the sport). The latter observations were proper. (*Towns v. Davidson*, *supra*, 147 Cal.App.4th at p. 472 ["expert's testimony may embrace an ultimate factual issue"].)

Further, while Szarowicz and his teammates were percipient witnesses rather than retained experts, they had many decades of combined experience playing in thousands of no-check hockey games. As highly experienced players with a vested interest in the sport, their testimony that Birenbaum's high speed, open ice check—with, in their opinion, no effort to play the puck—was outside the normal range of activity to be expected in no-check hockey, and that prohibiting such a check on an opponent oblivious to the impending collision would not

26

deter vigorous participation in the sport or fundamentally alter the nature of the sport, is certainly relevant.

*Avila*, *supra*, 38 Cal.4th 148—believed by the trial court to warrant summary judgment, and also heavily relied on by Birenbaum below and here—does not support summary judgment. *Avila* involved collegiate baseball. During an at-bat, the opposing pitcher hit Avila in the head with a pitch, allegedly in retaliation for one of the pitcher's teammates having been hit by a pitch the prior inning. The pitch cracked Avila's batting helmet and caused serious injuries. (*Id.* at pp. 152–153.) Avila sued numerous individuals and entities, including the school that hosted the game. (*Id.* at p. 153.) The school district successfully demurred on the ground that it was immune from liability as a public entity, and the Court of Appeal affirmed on that ground. (*Ibid.*)

The Supreme Court disagreed the immunity statute at issue applied (*Avila*, *supra*, 38 Cal.4th at pp. 154–160), but it found merit in the district's alternative argument—that under the primary assumption of risk doctrine, the district did not owe Avila a duty of care to protect him from the injuries he suffered. It concluded that being hit by a pitch is an inherent risk of baseball. (*Id.* at p. 163.) But it also went further: it concluded that being *intentionally* hit is an inherent risk of the sport, "so accepted by custom that a pitch intentionally thrown at a batter has its own terminology: 'brushback,' 'beanball,' 'chin music.' In turn, those pitchers notorious for throwing at hitters are 'headhunters.' " (*Id.* at p. 164.) The Court noted that the rules of baseball forbid intentionally throwing at a batter but, as it stated in *Knight*, " 'even when a participant's conduct violates a rule of the game and may subject the

27

violator to internal sanctions prescribed by the sport itself, imposition of *legal liability* for such conduct might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity that falls close to, but on the permissible side, of a prescribed rule.' " (*Id.* at p. 165, quoting *Knight, supra,* 3 Cal.4th at pp. 318–319.) Thus, the Court concluded, "For better or worse, being intentionally thrown at is a fundamental part and inherent risk of the sport of baseball. It is not the function of tort law to police such conduct." (*Avila,* at p. 165.)

The trial court's erroneous reliance on *Avila* here stems from its acceptance of a position advanced by Birenbaum: that because checking is an inherent risk of no-check hockey, *any* checking, *regardless of the degree,* is exempt from liability. This theory is flawed in its necessary premise that all checking is equal. *Avila* did not hold, as Birenbaum would have it, that when some intentional act is inherent in a given sport, any and all forms of that intentional conduct are immune from liability under the primary assumption of risk. While *Avila* extended the principles set forth in *Knight* to intentional conduct in the context of the allegations there, it did not overturn *Knight*'s holding that a participant in an active sport breaches a legal duty of care to other participants if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport. Thus, a check intended to cause injury or one that was so reckless it was totally outside the range of the ordinary activity involved in the sport may still subject the checker to tort liability. This was acknowledged by *Avila,* which recognized that not every intentional hit by a pitcher is an inherent risk

28

in baseball: "The conclusion that being intentionally hit by a pitch is an inherent risk of baseball extends only to situations such as that alleged here, where the hit batter is at the plate. Allegations that a pitcher intentionally hit a batter who was still in the on deck circle, or elsewhere, would present an entirely different scenario." (*Avila*, *supra*, 38 Cal.4th at p. 165, fn. 11.) Likewise here, where an incidental check may be an inherent risk in no-check hockey, but a reasonable trier of fact could find that a violent, full speed, open ice check on an oblivious opponent with no attempt to play the puck is " 'totally outside the range of the ordinary activity' " involved in no-check hockey. (*Id*. at p. 165.)

In addition to his misplaced reliance on *Avila*, Birenbaum cites a number of out-of-state and foreign hockey cases as "acknowledg[ing] the inherent risk of hockey."[7] These authorities do not avail him for multiple reasons, not the least of which is that none involves the application of the primary assumption of risk doctrine. And, indeed, the cases support our conclusion.

In *Levita v. Crew* (Ontario Superior Ct. of Justice 2015) 2015 ONSC 5316, the court recognized that "the inherent risks in the game of hockey include bodily contact . . . even in a non-contact league." (*Id.* at para. 85.) And it further observed it was "widely accepted that, by agreeing to play hockey and accepting its inherent risks, a player also accepts or gives his implied consent that there is some risk of injury." As particularly relevant here, however, the court next observed: "However, the law is consistent that certain acts go well beyond what is

---

[7] Birenbaum has requested that we take judicial notice of these cases. We grant his request.

29

acceptable. This principle is set forth in the seminal case of *Agar v. Canning* (1965), 54 W.W.R. 302 (Man. Q.B.), aff'd (1966), 55 W.W.R. 384 (Man. C.A.). In that case, the trial judge stated at para. 8: [¶] [A] little reflection will establish that some limit must be placed on a player's immunity from liability. Each case must be decided on its own facts so it is difficult, if not impossible, to decide how the line is to be drawn in every circumstance. *But injuries inflicted in circumstances which show a definite resolve to cause serious injury to another, even when there is provocation and in the heat of the game, should not fall within the scope of the implied consent.*" (*Id.* at para. 86.) The court confirmed that intentional injuries and reckless conduct fall outside the inherent risk of hockey (*id.* at para. 87), and concluded that while a hockey player assumes the risk of injuries caused by certain conduct, the player "never assumes the risk that he may suffer intentional or reckless battery by another player in a non-contact league." (*Id.* at para. 92.)

Three out-of-state cases Birenbaum cites—*Barton by Barton v. Hapeman by Hapeman* (N.Y. Supreme Ct., 1998) 251 A.D.2d 1052, *Karas v. Strevell* (Ill. 2008) 884 N.E.2d 122, and *Borella v. Renfro* (Mass. 2019) 137 N.E.3d 431—all involved liability for injuries suffered in check hockey games and are thus inapposite. Beyond that, they are factually distinguishable. *Barton* affirmed an order granting summary judgment because the defendant's "conduct was not a 'flagrant infraction[] unrelated to the normal method of playing the game and done without any competitive purpose . . . .'" (*Barton*, at p.1052.) *Karas* agreed with cases that "draw a line in a way that permits recovery for extreme misconduct during a sporting event that causes injury, while at the same time foreclosing liability for conduct which,

30

although it may amount to an infraction of the rules, is nevertheless an inherent and inevitable part of the sport." (*Karas*, at p. 459, citing *Knight*, *supra*, 3 Cal.4th at p. 320.) And *Borella* held that where the record was "devoid of evidence from which a jury rationally could conclude that the player's conduct is extreme misconduct outside the range of the ordinary activity inherent in the sport, there is no legal liability under the recklessness standard." (*Borella*, at p. 434.) These cases are consistent with our conclusion here, that while primary assumption of risk shields Birenbaum from liability if his check was within the scope of risks inherent in the sport of no-check hockey, he may be subject to liability if his check was intentionally injurious or so reckless as to constitute conduct outside the range of risks inherent to the sport—or as *Barton*, *Karak*, and *Borella* put it, the check was a flagrant infraction or extreme misconduct.

Lastly, *Overall v. Kadella* (Mich. Ct. of Appeals 1984) 361 N.W.2d 352 involved a fight that broke out after an ice hockey game ended, during which defendant struck the plaintiff and caused serious injuries. (*Id.* at p. 353.) This is hardly relevant here.

We close with the following observation we made in *Cohen*, *supra*, 159 Cal.App.4th 1476, 1498: "Keeping in mind that the question is simply whether respondent has shown, on the basis of undisputed material facts, that appellant cannot prove [respondent's] conduct was 'reckless' within the meaning of *Knight* and its progeny, all we decide is that respondent has failed to make the necessary showing and appellant therefore cannot be denied the right to present her case to a trier of fact." Likewise here.

31

**Birenbaum Has Not Established That He Is Entitled to Summary Adjudication**

In addition to summary judgment based on the primary assumption of risk, Birenbaum's motion also sought summary adjudication of the first cause of action for intentional tort and of the prayer for punitive damages. Because the trial court granted summary judgment, it did not rule on the requests for summary adjudication. On appeal, Szarowicz does not address the intentional tort cause of action, but he does urge that "there was sufficient evidence of a clear and convincing nature to support a claim for punitive damages."[8] Because our review is de novo, it is appropriate for us to rule on Birenbaum's requests for summary adjudication. We do so, and we deny them.

As to the cause of action for intentional tort, Szarowicz alleges that Birenbaum intentionally harmed him when he "maliciously charged and illegally body-checked [him] after taking six full speed strides, blind-siding and knocking him into the air and then onto the ice, causing him to lose consciousness . . . and [suffer] severe injuries . . . ." Birenbaum's argument in support of summary adjudication of this cause of action consists entirely of this: "The Supreme Court's holding in *Avila, supra*, 38 Cal.4th 148 is on all fours with this hockey injury case. As demonstrated in the discussion above, even if Defendant's conduct was intentional, and would subject him to league penalties, the collision and Plaintiff's injury are inherent to the sport. Nothing Defendant did was totally outside the range of activity involved. The conduct Plaintiff

---

[8] Birenbaum does not respond to this argument, nor does he address summary adjudication of the intentional tort claim.

complains of, if true, may subject Defendant to the penalty box or remove him from the game, and penalize his team in the process, but this is not a matter for the civil courts to police."

As a preliminary matter, we question whether the primary assumption of risk applies to Szarowicz's intentional tort claim where he is alleging that Birenbaum intended to harm him. (See, e.g., *Ordway v. Superior Court* (1988) 198 Cal.App.3d 98, 108 ["Historically, the doctrine of assumption of risk has provided a defense only to actions for negligence. It has little or no application in the case of intentional or reckless conduct"].) *Avila, supra*, 38 Cal.4th 148 extended *Knight*'s principles to intentional *conduct*, but that is not to be confused with an intentional *tort* that alleges an intent to harm.

But even if we agree Szarowicz's intentional tort claim falls within the scope of the primary assumption of risk, summary adjudication of the claim is unwarranted here. As discussed above, Szarowicz's evidence raised a triable issue of material fact as to whether Birenbaum in fact intended to injure him. That evidence included this: The Icehounds and the Thousand Eyes were playing in the deciding game of the season championship series. Earlier in the game, Birenbaum had crosschecked one of Szarowicz's teammates, prompting Szarowicz to ask him why he was so angry. Later in the game, Birenbaum did the same thing to Szarowicz, "kind of ramm[ing his stick crosswise] down into the back of [his] pants actually." With just minutes to go in the game, and with Birenbaum's team down five goals to two and on the verge of losing the championship title, Birenbaum took at least six full strides and violently checked Szarowicz, who was chasing the puck, unaware of Birenbaum's approach. Szarowicz's witnesses testified that Birenbaum

33

made no attempt to play to the puck and instead made a play on Szarowicz, evidenced by the speed he attained, his failure to make any attempt to slow down or avoid Szarowicz, his trajectory, and the facts that his stick was up because he was not reaching for the puck and that he remained standing after the collision because he has braced for the impact. Based on this, a trier of fact could find that Birenbaum intended to harm Szarowicz.

Turning to Szarowicz's prayer for punitive damages, Civil Code section 3294 authorizes such damages "[i]n an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice . . . ." (Civ. Code, § 3294, subd. (a).) "Malice" in this context means "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (*Id*., subd. (c)(1).)

The standard for a motion for summary adjudication on a claim for punitive damages is whether clear and convincing evidence exists to support that claim. (*American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton* (2002) 96 Cal.App.4th 1017, 1049; see also *Reid v. Smithkline Beecham Corp.* (S.D. Cal. 2005) 366 F.Supp.2d 989, 1001 [applying California law; clear and convincing evidence standard applies to punitive damages claim, even at summary judgment stage].) While a plaintiff need not prove his or her case for punitive damages to defeat summary adjudication, "[i]n ruling on a summary judgment or summary adjudication motion, 'the judge must view the evidence presented through the prism of the substantive [clear and convincing] evidentiary

34

burden. . . ." (*American Airlines, Inc.* at p. 1049; *Rowe v. Superior Court* (1993) 15 Cal.App.4th 1711, 1723 [to defeat summary adjudication, plaintiff must "demonstrate the existence of sufficient evidence to establish a prima facie case for punitive damages, having in mind the higher clear and convincing standard of proof"]; accord, *Butte Fire Cases* (2018) 24 Cal.App.5th 1150, 1158–1159.)

For purposes of his motion, Birenbaum does not dispute that his conduct was intentional. This concession alone defeats summary adjudication of the prayer for punitive damages. That Birenbaum intended to check an unaware Szarowicz after taking at least six full strides to attain a high speed and made no effort to slow down before making contact—conduct that, according to Valdebenito, "would be considered a dangerous and illegal hit even by NHL standards"—was ample evidence of despicable conduct with a willful and conscious disregard of Szarowicz's safety.

Further, the evidence discussed above with respect to the intentional tort claim is equally applicable here, and it raises a triable issue as to whether Birenbaum intended to harm Szarowicz or engaged in despicable conduct within the meaning of Civil Code section 3294.

## DISPOSITION

The summary judgment is reversed. Summary adjudication of the cause of action for intentional tort and the prayer for punitive damages is denied. Szarowicz shall recover his costs on appeal.

_____
Richman, Acting P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.

*Szarowicz v. Birenbaum* (A156312)

36

Trial Court:                          San Francisco County Superior
                                      Court

Trial Judge:                          Honorable Suzanne R. Bolanos

Attorneys for Plaintiff and           Tardiff Law Office, Neil S. Tardiff;
Appellant Michael Szarowicz:          Law Offices of David S. Vogel,
                                      David S. Vogel

Attorneys for Defendant and           Demler, Armstrong & Rowland,
Respondent Jeremy Birenbaum:          LLP, George A. Ostott, Jr., John
                                      R. Brydon, Lisa L. Pan.